# IN THE SUPREME COURT OF IOWA

No. 12–0827

Filed July 11, 2014

**IOWA FARM BUREAU FEDERATION, IOWA RENEWABLE FUELS ASSOCIATION,** and **IOWA WATER ENVIRONMENT ASSOCIATION,**

    Appellants,

and

**AGRIBUSINESS ASSOCIATION OF IOWA, ASSOCIATION OF BUSINESS AND INDUSTRY, IOWA CATTLEMEN'S ASSOCIATION, IOWA INSTITUTE FOR COOPERATIVES, IOWA LIMESTONE PRODUCERS ASSOCIATION, IOWA PORK PRODUCERS ASSOCIATION, IOWA POULTRY ASSOCIATION, IOWA TURKEY FEDERATION,** and **IOWA CORN GROWERS ASSOCIATION,**

    Appellants,

vs.

**ENVIRONMENTAL PROTECTION COMMISSION**
and **IOWA DEPARTMENT OF NATURAL RESOURCES,**

    Appellees,

and

**ENVIRONMENTAL LAW & POLICY CENTER OF THE MIDWEST, IOWA ENVIRONMENTAL COUNCIL,** and the **SIERRA CLUB,**

    Appellees.

---

Appeal from the Iowa District Court for Polk County, Bradley McCall and Mary Pat Gunderson, Judges.

Petitioners and intervenors appeal from the summary judgment granted by the district court in a judicial review action. **AFFIRMED.**

Michael L. Mock and Karl T. Olson of Parker, Simons & McNeill, P.L.C., West Des Moines, and Julia L. Vyskocil and Eldon L. McAfee of Beving, Swanson & Forrest, P.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, David R. Sheridan and David S. Steward, Assistant Attorneys General, for appellees Environmental Protection Commission and Iowa Department of Natural Resources.

Bradley D. Klein, Chicago, Illinois, and Joshua T. Mandelbaum, Des Moines, for intervenor-appellee Environmental Law & Policy Center, and Wallace L. Taylor, Cedar Rapids, for appellee Sierra Club.

**CADY, Chief Justice.**

In this appeal, we decide two issues concerning the qualifications of persons who serve state government on commissions that engage in rulemaking. First, we must decide whether an Iowan who served on a commission was disqualified to vote on the adoption of a rule and regulation when she engaged in activities in her employment in support of the rule. Second, we must decide whether a rule adopted by a commission was invalid after it was discovered that a member who participated in the voting was not actually qualified to serve on the commission because she had lost her status as an elector in Iowa.

On our review of the decision by the district court, we conclude the nature of rulemaking does not disqualify a commission member from voting to adopt rules she personally and professionally supported. We also conclude that the disqualification of a commission member does not invalidate the action taken by the commission when the particular disqualification did not undermine the integrity of the process and when the public interest supports validating the rule despite the disqualification. We affirm the decision of the district court.

## I. Background Facts and Proceedings.

The Environmental Protection Commission exists to protect Iowa's environment and conserve its natural resources. One of its primary duties is to establish policies and make rules governing the environment, including the adoption of rules to implement federal environmental programs. *See* Iowa Code § 455A.6(6)(*a*) (2009). The Commission is composed of nine members appointed by the Governor subject to senate confirmation. *Id.* § 455A.6(1). The members serve staggered four-year terms. *Id.* The Commission meets at numerous times throughout the year, usually monthly, and the members receive per diem compensation

in addition to reimbursement for expenses. *Id.* § 455A.6(3), (4). Membership on the Commission is not a full-time position. Members usually have other careers and employment, but join hundreds of other Iowans to participate in the operation of government by serving on various boards and commissions that assist in the operation of government.

In March 2007, Governor Chet Culver appointed Susan Heathcote to the Commission. The appointment was confirmed by the senate. Heathcote was employed by the Iowa Environmental Council. The Iowa Environmental Council is a nonprofit corporation located in Des Moines. Its function is to work to protect Iowa's natural environment. Heathcote held the position of Water Program Director and was responsible for researching environmental issues, advising the Council on policy, and representing the Council on advisory groups. Heathcote began working for the Council in 1996.

In May 2009, Governor Culver appointed Carrie La Seur to the Commission. Her appointment was also confirmed by the senate. She lived in Mount Vernon, Iowa, at the time of her appointment. La Seur is a lawyer and ran an organization called Plains Justice. She served as secretary of the Commission.

In July 2009, La Seur moved to Montana. Her husband was a professor at Cornell College in Mount Vernon, and she accompanied him when he left Iowa on a teaching sabbatical in Montana. La Seur, however, continued to own a home in Mount Vernon during the sabbatical and continued to serve on the Commission. She returned to Iowa for Commission meetings or appeared by telephone conference call.

La Seur obtained a Montana drivers' license after moving and registered to vote in Montana in July 2009. She was previously

registered to vote in Iowa. The sabbatical turned into a permanent move after La Seur's husband accepted a job offer to work in Montana in January 2010.

Heathcote and La Seur served on the Commission during a critical period of time when it considered the adoption of rules to prevent the degradation of existing water quality of Iowa's water resources. The United States Environmental Protection Agency (EPA) promulgated a regulation in 1983, which required states to adopt policies aimed at preventing degradation of existing water quality and consistent with federal criteria. *See* 48 Fed. Reg. 51,400–01 (Nov. 8, 1983) (codified at 40 C.F.R. § 131.6 (2010)). The EPA promulgated the regulation pursuant to the Federal Water Pollution Control Act, which is better known as the Clean Water Act (CWA). *See* 33 U.S.C. § 1313(a)(3)(A) (2006) (requiring states to establish water quality standards). One component of a state's water quality standards submission is "[a]n antidegradation policy consistent with § 131.12." 40 C.F.R. § 131.6(d). For an antidegradation policy to be consistent with federal criteria, it must, at a minimum, maintain and protect certain existing uses of waterways. *Id.* § 131.12(a)(1). Iowa law similarly requires the Iowa Department of Natural Resources (IDNR), through the Commission, to "[e]stablish, modify, or repeal water quality standards, pretreatment standards, and effluent standards." Iowa Code § 455B.173(2).

Iowa was slow to respond to the federal regulation, despite efforts by federal authorities over the years to spur Iowa to begin the implementation process. In July 2007, the IDNR finally initiated what ultimately would be a three-year process of adopting rules to implement the federal antidegradation program. The process began with a meeting between the individuals from the IDNR, Iowa Environmental Council,

Iowa Chapter of the Sierra Club, Hawkeye Fly Fishing Association, and the Environmental Law and Policy Center. Two petitions for rulemaking with recommended antidegradation rules were subsequently submitted to the IDNR in support of the development of appropriate antidegradation standards. The first petition was submitted in October 2007 by a coalition of water quality groups consisting of the Iowa Environmental Council, Iowa Chapter of the Sierra Club, and Hawkeye Fly Fishing Association. In June 2008, Iowa Farm Bureau Federation and other agribusiness and industrial interests filed a second petition for rulemaking that sought a different set of antidegradation standards. The antidegradation rules advocated in the first petition were generally more stringent than the rules advocated in the second petition.

Heathcote played an active role in her employment with the Iowa Environmental Council in developing the proposed rules submitted to the IDNR in the October petition by her employer and the other coalition groups. She was also active in pushing the IDNR to initiate the rulemaking process, and she remained involved in the process the IDNR followed after the petitions for rulemaking were filed. Heathcote was recognized as a lead person among the environmental groups advocating for the first petition.

The IDNR held numerous workshops and meetings with various stakeholders after the petitions were filed. It also solicited public comments and held various public hearings. Heathcote advocated in support of the first petition at all stages of the process.

After considering the petitions and the input provided by the rulemaking process, the IDNR drafted a proposed antidegradation rule for the state, as well as proposed implementation procedures. The proposed rules and procedures would eventually be submitted to the

Commission for approval. The rules drafted by the IDNR differed from the rules proposed by the two petitions, but they were more closely aligned to the proposals in the first petition.

In December 2009, the Commission approved the final antidegradation rules and procedures by a vote of six to two. Heathcote and La Seur voted to approve the rules, and one member of the Commission abstained.

The rules and procedures approved by the Commission were then approved by a legislative committee and submitted to the EPA for review and approval. Iowa's antidegradation rules and procedures were approved by the EPA in September 2010.

In October 2010, Iowa Farm Bureau Federation and two other associations filed a petition for judicial review under section 17A.19 of the Iowa Administrative Procedure Act (IAPA).[1] The petition sought to overturn the Iowa Antidegradation Standards and Implementation Procedures. They allege the action taken by the Commission was invalid because Heathcote was disqualified to vote due to a conflict of interest, and La Seur was disqualified to serve on the Commission at the time she voted because she did not satisfy the requirement for Commission members to be eligible Iowa electors.

In April 2011, the Commission filed a motion for summary judgment in response to the petition for judicial review. It claimed neither Heathcote nor La Seur was disqualified from voting as a matter of law. Farm Bureau responded to the motion by requesting time to reply so that it could pursue discovery of facts and information relevant to the summary judgment proceedings. It also moved to compel discovery from

---

[1]The petitioners will be collectively referred to in this opinion as Farm Bureau.

the Iowa Environmental Council, which had intervened in the case. Farm Bureau had previously obtained extensive documents and materials from the Commission, IDNR, and Iowa Environmental Council pursuant to subpoenas and other methods of discovery, but wanted additional production of internal records and documents relating to Heathcote's employment and other activities related to her employment, as well as all other communications by Heathcote relating to the process and the adoption of the antidegradation rule. This request included emails and other communications between staff, attorneys, donors, and others. The Iowa Environmental Council claimed the discovery request sought confidential and protected information and was overly burdensome and largely unnecessary to resolve the substantive issues.

The district court denied the motion to compel discovery and granted the motion to quash filed by the Iowa Environmental Council. Farm Bureau eventually filed a resistance to the summary judgment motion and sought summary judgment on the issue involving the disqualification of La Seur.

The district court granted summary judgment for the Commission, denied summary judgment sought by Farm Bureau, and dismissed the petition. Farm Bureau appealed and raised three issues. First, it claims the district court erred by granting summary judgment prior to the close of discovery. Second, it claims the district court erred by granting summary judgment to the Commission on Farm Bureau's claim that Heathcote had a conflict of interest that required vacating the antidegradation policy. Finally, Farm Bureau contends the district court erred by granting summary judgment to the Commission regarding Farm Bureau's claim that La Seur's registration to vote in Montana voided her status as an eligible Iowa elector and that she was in turn no longer

qualified to serve on the Commission. Accordingly, Farm Bureau argues the district court also erred by not vacating the antidegradation policy on this ground.

## II. Scope of Review.

We review a decision to deny discovery by the district court for abuse of discretion. *Kulish v. Ellsworth,* 566 N.W.2d 885, 889 (Iowa 1997). We review a decision by the district court to grant summary judgment for correction of errors at law. *Rucker v. Humboldt Cmty. Sch. Dist.,* 737 N.W.2d 292, 293 (Iowa 2007); Iowa R. App. P. 6.907.

## III. Discovery Prior to Summary Judgment.

The decision to deny or grant a continuance of a motion for summary judgment to pursue discovery lies within the discretion of the trial court. *Kulish,* 566 N.W.2d at 889. Generally, a party to a lawsuit should be allowed to complete discovery before summary judgment is considered. *Miller v. Cont'l Ins. Co.,* 392 N.W.2d 500, 503 (Iowa 1986).

Although a continuance would ordinarily be appropriate in a case of this nature, it is clear the salient facts relevant to the claim that Heathcote was disqualified from voting had emerged by the time the summary judgment was filed. As an employee of the Iowa Environmental Council, Heathcote unquestionably played an active role in urging the IDNR to move forward with antidegradation rules and procedures and she actively participated in filing and promoting a petition for rulemaking with the IDNR. She also advocated on behalf of her employer for the stringent rules proposed by the advocacy groups responsible for filing the petition and was engaged in the process established by the IDNR to address both petitions for rulemaking. Heathcote advocated that the IDNR propose stringent antidegradation rules and procedures to the

Commission, upon which she served, for approval. Farm Bureau had obtained ample discovery to pursue its legal challenge in this case.

Importantly, the structural claim of a conflict of interest asserted by Farm Bureau was not based on hidden conduct by the Iowa Environmental Council or the IDNR. Instead, the claims squarely centered on a very open and visible dual role that Heathcote performed as an advocate and ultimate adjudicator. There were ample considerations to balance by the district court, and it was within the court's discretion to deny discovery.

### IV. Disqualification of Commissioner Heathcote.

The resolution of this case first requires a full understanding of the process followed in our government to implement regulations within the executive branch. At first blush, the idea of an individual serving as both an advocate and a decision-maker seems contrary to our general governmental approach. We must decide if this initial response rings true upon deeper inquiry into the rulemaking function of government.

Within our governmental structure, the IDNR is administered by a director appointed by the Governor, subject to senate confirmation. Iowa Code § 455A.3. The director serves at the pleasure of the Governor. *Id.* Generally, the director has the power and duty to administer the IDNR as provided by the legislature. *Id.* § 455A.4. Our legislature, however, also established the Environmental Protection Commission to perform certain overview responsibilities, including the duty to establish policy and rules for the effective administration of the IDNR. *Id.* § 455A.6(6)(*a*).

Consistent with most commissions within the executive branch of government, the Environmental Protection Commission is composed of a citizen panel. This approach is part of the larger venerable governmental process of citizen participation and voice in our democracy that together

with direct participation by publicly elected officials marks the strength and vibrancy of our democracy.

As a component of the executive branch of government, the members of the Environmental Protection Commission are appointed by the Governor, subject to senate confirmation. *Id.* § 455A.6(1). The integrity and strength of citizen participation is established by the required composition of the membership of the Commission. All members must be electors of Iowa and all members must have knowledge of the subjects embraced under the governing laws. *Id.* More specifically, three members of the Commission must be actively engaged in livestock and grain farming, one member must be an active manager of a manufacturing company, and one member must be actively working in finance or commerce. *Id.* § 455A.6(1)(*a*), (*b*), (*c*). The remaining four members do not need any specific employment or background, other than to be an elector and have knowledge of the subject matter of the Commission. *Id.* § 455A.6(1)(*d*). An elector is a person eligible to vote in Iowa. *See* Iowa Const. art. II, § 1.

The Governor may not make appointments to the Commission based on political considerations, other than to meet the general requirements for the membership of appointive boards and commissions in this state to satisfy the balance of political affiliation under Iowa Code section 69.16. Iowa Code § 455A.6(1). Yet, this statutory requirement does not infringe upon the prerogative of a governor to otherwise appoint individuals to the Commission who may share the views of the Governor on the subject matter of the Commission or individuals who may even publicly advocate those views in their personal or professional life. All individuals who work in a particular discipline acquire special knowledge and develop perspectives and views about various issues. By requiring

some members of the Environmental Protection Commission to specifically work in certain areas and by requiring all members to have special knowledge of the subject matter of the Commission, the legislative scheme appears to contemplate that individual views, perspectives, and knowledge are desired strengths.

Moreover, a governor, as the top-elected representative of the people, has always had the ability to shape the overall perspective and direction of commissions through the power of appointment. Thus, the "political considerations" excluded from the appointment process by statute do not normally extend to the ability of a governor to appoint Commission members who have particular views about subjects expected to come before the Commission that may be consistent with the views of the Governor or the political party of the Governor. Instead, this concept reflects the basic nature of governing through public elections and is deeply embedded within the executive and legislative branches of government.

This background does not undermine or oppose the claim asserted by Farm Bureau in this case that Heathcote should have been disqualified. Instead, it permits it. *See id.* § 17A.19. One of the specific grounds for judicial review of agency action permits courts to grant relief from an action taken by an agency when it was "[t]he product of decision making undertaken by persons who were improperly constituted as a decision-making body, were motivated by an improper purpose, or were subject to disqualification." *Id.* § 17A.19(10)(*e*). Accordingly, Farm Bureau uses the IAPA to frame its core claim that its rights were prejudiced by the Commission action in this case because Heathcote was "motivated by an improper purpose" and should have been disqualified from voting. *Id.*

The claim by Farm Bureau that the Commission rulemaking action was motivated by an improper purpose and was subject to disqualification is based on the dual role of Heathcote as a strong and active advocate, both personally and on behalf of her employer, before the IDNR at the same time as she was a member of the Commission that would ultimately be responsible to approve an antidegradation rule developed by the IDNR. More specifically, Farm Bureau argued the actions of Heathcote violated the conflict-of-interest statute that restricts outside employment and activities by a person who is employed by the state or otherwise serves the state. *See id.* § 68B.2A(1)(*a*), (*b*). This statute prohibits a state employee or other person serving the state from engaging in outside employment or activity that conflicts with the person's official duties and responsibilities. *See id.* § 68B.2A(1).

To aid in a determination whether a particular outside employment or activity creates an unacceptable conflict of interest, the legislature identified three types of unacceptable conflicts. *See id.* One situation concerns outside employment or activity that involves the use of state time or resources or the use of state identification that gives the person an advantage or benefit not available to the general public. *Id.* § 68B.2A(1)(*a*). Another situation deemed an unacceptable conflict by the legislature is when the outside employment or activity involves consideration received by a state employee from someone other than the state for performing work that is a part of the duties and responsibilities of state employment. *Id.* § 68B.2A(1)(*b*).

We have in the past determined that a statutory conflict can serve to disqualify the vote of a member of a governmental council or commission. *Wilson v. Iowa City*, 165 N.W.2d 813, 823 (Iowa 1969). In *Wilson,* we confronted a statute that prohibited a public official from

acquiring a personal interest in an urban renewal project and, specifically, disqualified officials with such an interest from voting on a project. *Id.* at 817; *see also* Iowa Code § 403.16 (1966) (prohibiting interested officials from participating in urban renewal proceedings).[2] We held a city councilman violated this statute and was disqualified from voting to approve an urban renewal plan because he was employed by an entity that owned real estate in the project area that would directly benefit by the renewal project. *Wilson*, 165 N.W.2d at 823. Furthermore, the councilman was expected to work with the city in his employment on various interests in the renewal project. *Id.* We found the nature of the employment duties created a disqualifying personal interest, even though there was no direct financial advantage to the councilman. *Id.* at 821–23. We recognized the councilman had dual interests at stake—duties to his employer and duties of the city council—and that his dual interests had a potential to present the disqualifying conflict. *Id.* at 823. We emphasized that the councilman's employer had an "unusual and direct" financial interest in the renewal proceedings: his employer had the

---

[2]That section provided, in relevant part:

> No public official or employee of a municipality, or board or commission thereof . . . shall voluntarily acquire any personal interest, direct or indirect, in any urban renewal project, or in any property included or planned to be included in any urban renewal project of such municipality, or in any contract or proposed contract in connection with such urban renewal project. . . . If any such official, commissioner or employee presently owns or controls, or has owned or controlled within the preceding two years, any interest, direct or indirect, in any property which he knows is included or planned to be included in an urban renewal project, he shall immediately disclose this fact in writing to the local governing body, and such disclosure shall be entered upon the minutes of the governing body; and any such official, commissioner or employee shall not participate in any action by the municipality, or board or commission thereof, or urban renewal agency affecting such property.

Iowa Code § 403.16 (1966).

exclusive right to purchase some of the land the city condemned. *Id.* at 821, 823.

Farm Bureau avers section 68B.2A(1)(*a*) and (*b*) provides the applicable statutory standard for the disqualification of Heathcote in this case. Yet, unlike the underlying statute in *Wilson*, section 68B.2A does not prohibit members of commissions from voting if they have an unacceptable conflict as defined in subsections (1)(*a*) and (*b*); instead, it merely requires the official to "cease the employment or activity." Iowa Code § 68B.2A(2). This is not to say section 68B.2A does not support disqualification of those officials who have unacceptable conflicts of interest. It does, just not for the conflict of interest Farm Bureau alleges should have disqualified Heathcote. *See id.* (providing that officials whose outside employment creates a conflict under either subsection (1)(*c*) or else a rule promulgated by the ethics board pursuant to subsection (4) shall "refrain from taking any official action or performing any official duty that would detrimentally affect or create a benefit for the outside employment or activity" if the official does not cease the activity). The violations of section 68B.2A claimed by Farm Bureau do not necessarily support automatic disqualification as a remedy for violation.

We also recognize chapter 68B includes a specific ban on lobbying by state officials before certain boards. *Id.* § 68B.5A; *see City of Des Moines v. City Dev. Bd.*, 633 N.W.2d 305, 311–12 (Iowa 2001) (discussing the relationship between general and specific statutes). The Government Ethics and Lobbying Act, however, excludes members of boards and commissions from that ban. *See* Iowa Code §§ 68B.2, .5A. Section 68B.5A(1) prohibits lobbying by any "statewide elected official, the executive or administrative head of an agency of state government, the deputy executive or administrative head of an agency of state

government, or member of the general assembly." *Id.* § 68B.5A(1). Section 68B.5A(2) prohibits "[t]he head of a major subunit of a department or independent state agency whose position involves substantial exercise of administrative discretion or the expenditure of public funds" as well as certain employees "whose position involves substantial exercise of administrative discretion or the expenditure of public funds" from "lobbying before the agency in which the person is employed or before . . . whom the person has substantial or regular contact as part of the person's duties." *Id.* § 68B.5A(2). Section 68B.5A(3) prohibits other employees from lobbying with respect to "any particular case, proceeding, or application with respect to which the person is directly concerned and personally participates as part of the person's employment." *Id.* § 68B.5A(3). All three subsections create a limited exception that permits an individual to lobby if specifically designated by the agency for which the individual works. *Id.* § 68B.5A(1)–(3).

However, a member of a board or a commission does not fall into any of these statutory categories. A member of a board or commission is an "official," a term that consists of a specific enumeration of positions. *Id.* § 68B.2(17). Notably, many of the individuals who constitute the class of "officials" are identified in the outright ban on lobbying contained in section 68B.5A(1), with the notable exceptions of the heads of major subunits of departments or agencies and members of boards or commissions. *See id.* § 68B.5A(1). Of course, the heads of major subunits are barred from a narrower scope of lobbying—lobbying before their agency or an agency they regularly contact—in section 68B.5A(2). *See id.* § 68B.5A(2). Yet, the first two subsections do not mention members of boards or commissions. *See id.* § 68B.5A(1), (2).

Furthermore, a "[s]tate employee" is not an "official." *Id.* § 68B.2(25). Thus, the narrowest ban on lobbying contained in section 68B.5A(3) does not apply to members of boards or commissions. In construing section 68B.2A as identified by Farm Bureau, we cannot ignore the more specific statute on point that does not prohibit lobbying by members of boards or commissions.

Of course, many of the general principles identified in *Wilson* remain applicable. As Farm Bureau points out, *Wilson* recognized many conflict of interest statutes "are merely declaratory of the common law." 165 N.W.2d at 822. Indeed, we did not "limit ourselves to the literal language of [section 403.16] alone" in *Wilson. Id.* Here, section 68B.2A(3) expressly disavows displacing common law. *See* Iowa Code § 68B.2A(3) ("Unless otherwise specifically provided the requirements of this section shall be in addition to, and shall not supersede, any other rights or remedies provided by law."). Additionally, we think section 17A.19(10) of the IAPA incorporates general common law conflict-of-interest principles. Notably, section 17A.19(10)(*e*) not only prohibits action that was "motivated by an improper purpose," but also action taken when the administrator was "subject to disqualification." *Id.* § 17A.19(10)(*e*). It seems that the legislature intended to incorporate general conflict-of-interest standards and enable judicial development of these standards.

Conflict-of-interest rules, "whether common law or statutory, are based on moral principles and public policy." *Wilson,* 165 N.W.2d at 822. "They demand complete loyalty to the public and seek to avoid subjecting a public servant to the difficult, and often insoluble, task of deciding between public duty and private advantage." *Id.* "It is not necessary that this advantage be a financial one," and "[t]he employer–

employee relationship has always been recognized as one source of possible conflict of interest." *Id.* at 822, 823. To be more accurate, we have viewed the specific conflict in an employer–employee relationship context "as a conflict of duties rather than a conflict of interest." *Id.* at 823. In this regard, our basic inquiry considers how the conflict impacts loyalty and duty to perform the commission work. *See id.* To be sure, an urban renewal proceeding is only one type of official action, and *Wilson* itself treated its facts as unique. *See id.* at 821–23. Therefore, section 68B.2A *is* relevant, but we must examine the particular claim of conflict asserted within the role of rulemaking. We thus proceed to identify a standard to utilize to resolve the conflict-of-interest issue presented.

We begin by examining the nature of agency rulemaking. The standard of disqualification based on a conflict of interest would not necessarily be the same in every type of agency action. Generally, agency action encompasses the product of rulemaking, contested cases, and other agency action. *Smith v. Iowa Bd. of Med. Exam'rs*, 729 N.W.2d 822, 826 (Iowa 2007). A contested case is

> a proceeding including but not restricted to ratemaking, price fixing, and licensing in which the legal rights, duties or privileges of a party are required by Constitution or statute to be determined by an agency after an opportunity for an evidentiary hearing.

Iowa Code § 17A.2(5). In contrast, rulemaking is the "process for adopting, amending, or repealing a rule." *Id.* § 17A.2(12). A rule is a "statement of general applicability that implements, interprets, or prescribes law or policy." *Id.* § 17A.2(11). A rule is not, however, "[a] determination, decision, or order in a contested case." *Id.* § 17A.2(11)(*d*). Section 17A.2 thus creates an irreducible dichotomy between rulemaking

and contested cases. The importance of this dichotomous relationship is fully revealed by the facts of this case.

The diverse forms of agency action necessitate different standards of review depending on the agency action and the context of the challenge. *See* Iowa Code § 17A.19(10). We have also said the distinction between forms of agency action is important for determining the amount of "due process afforded to parties." *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 834 (Iowa 2002). For the reasons that follow, we think the distinction is similarly relevant to the standard for disqualifying an administrator. One standard—employed in *Wilson* and suggested by Farm Bureau—focuses on the potential for a conflict or the appearance of bias. *See* 165 N.W.2d at 822 ("It is the Potential for conflict of interest which the law desires to avoid."). We take note that this standard is closely similar to a standard utilized by federal courts in some contexts, which defines a disqualifying interest as any interest on the part of an administrator that could cause " 'a disinterested observer [to] conclude that (the agency) has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.' " *See Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 469 (2d Cir. 1959)). Under the *Cinderella* standard, adjudicatory hearings before the agency " 'must be attended, not only with every element of fairness but with the very appearance of complete fairness.' " *Id.* (quoting *Texaco, Inc. v. FTC*, 366 F.2d 754, 760 (D.C. Cir. 1964)).

The *Cinderella* standard is generally compatible, not only to the standard employed in *Wilson*, but the standard we have applied in the context of contested cases as well. *See Anstey v. Iowa State Commerce*

*Comm'n,* 292 N.W.2d 380, 390 (Iowa 1980) ("We believe that agency personnel charged with making decisions of great import . . . should be guided by the rationale of [Canon 2 of the Code of Judicial Conduct as it existed in 1980, which provided that '[a] judge should avoid impropriety and the appearance of impropriety in all of his activities.']").[3]   Yet, *Anstey's* contemporary cases reveal bias is not an unlimited concept.  We stated in another case:

> As here employed the term "bias" means adverse, preconceived mental attitude or disposition, *toward a party to a controversy*, of such weight and nature as to materially impair or destroy that impartiality essential to a fair hearing. *It does not relate to views entertained regarding the subject matter involved* . . . .

*Cedar Rapids Steel Transp., Inc. v. Iowa State Commerce Comm'n,* 160 N.W.2d 825, 837 (Iowa 1968) (emphasis added).  After all, a claim of bias in the context of contested cases "becomes a justiciable issue only as it bears on the fairness of the hearing." *Anstey,* 292 N.W.2d at 390.  In the context of due process in adjudicative proceedings before school boards, the presumption of objectivity and impartiality in contested cases "will typically be determinative of the bias issue" and can only be overcome by "direct, compelling evidence to the contrary." *Bd. of Dirs. v. Justmann,* 476 N.W.2d 335, 340 (Iowa 1991).

Anstey itself recognized that comments generally suggestive of a particular policy position do not require disqualification in the adjudicatory context.  *See* 292 N.W.2d at 391.  In the context of an administrator who had made statements in a contested case surrounding extension of electrical transmission lines, we said:

---

[3]A current component of the Code of Judicial Conduct requires a judge to "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned."  Iowa Ct R. 51:2.11(A).

> Van Nostrand's statements at the Energy Policy Council that few objections are good, that most objectors are motivated by financial considerations and that most objectors merely want the lines to cross other peoples' property, while they might be interpreted as leaning toward the general view that electrical transmission franchises should be extended, are not shown to be directly referable to this particular line or to the objections to it.

*Id.* at 390. Thus,

> taking a position, even in public, on a policy issue related to the dispute does not disqualify a decision maker. In order to disqualify him, it must be shown "that he is not capable of judging a particular controversy fairly on the basis of its own circumstances."

*Id.* (quoting *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493, 96 S. Ct. 2308, 2314, 49 L. Ed. 2d 1, 9 (1976)); *accord United States v. Morgan*, 313 U.S. 409, 421, 61 S. Ct. 999, 1004, 85 L. Ed. 1429, 1435 (1941).

Notwithstanding, a rulemaking is different from a contested case and follows a different standard for disqualification. *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1165–70 (D.C. Cir. 1979); *accord Lead Indus. Ass'n v. EPA*, 647 F.2d 1130, 1179 (D.C. Cir. 1980). This different standard is based on the broad distinctions between rulemaking and a contested case proceeding, as well as the different due process concerns.

In a rulemaking, agencies are expected to "allocate resources more efficiently, act with greater speed, and give specific notice to industries of the scope" of the proposed rule. *Ass'n of Nat'l Advertisers*, 627 F.2d at 1166; *see also Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 690–91 (D.C. Cir. 1973) (recognizing the efficiency that accrues to rulemaking proceedings). "The legitimate functions of a policymaker, unlike an adjudicator, demand interchange and discussion about important issues." *Ass'n of Nat'l Advertisers*, 627 F.2d at 1168. Indeed, effective

officials "*must* engage in debate and discussion about policy matters before [the Agency]," and " 'informal contacts between agencies and the public are the "bread and butter" of the process of administration.' " *Id.* at 1169 (emphasis added) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 57 (D.C. Cir. 1977) (per curiam)).

Thus, "[t]he *Cinderella* view of a neutral and detached adjudicator is simply an inapposite role model for an administrator who must translate broad statutory commands into concrete social policies." *Id.* at 1168–69. Due process in a rulemaking does not "impose judicial roles upon administrators when they perform functions very different from those of judges." *See id.* at 1168. Consequently, the *Association of National Advertisers* standard will disqualify a commissioner "only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding." *Id.* at 1170.

The D.C. Circuit has uniformly applied this standard to challenges to informal rulemaking proceedings asserting an administrator should have recused himself or herself. *See Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011); *PLMRS Narrowband Corp. v. FCC*, 182 F.3d 995, 1002 (D.C. Cir. 1999); *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1564 (D.C. Cir. 1991); *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 427 (D.C. Cir. 1986); *United Steel Workers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1209 (D.C. Cir. 1980). Other courts have adopted this rubric as well. *See Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1467 (9th Cir. 1987); *Citizens for a Better Env't v. Illinois Pollution Control Bd.*, 504 N.E.2d 166, 171 (Ill. App. Ct. 1987); *Fogle v. H & G Rest., Inc.*, 654 A.2d 449, 462 (Md. 1995); *Nw. Bell Tel. Co. v. Stofferahn*, 461 N.W.2d 129, 133–34 (S.D. 1990); *Tenn.*

*Cable Tel. Ass'n v. Tenn. Pub. Serv. Comm'n*, 844 S.W.2d 151, 165 (Tenn. Ct. App. 1992); *see also Mun. Servs. Corp. v. State ex rel. N.D. Dep't of Health & Consol. Labs.*, 483 N.W.2d 560, 563–64 (N.D. 1992) (citing favorably cases applying the *Association of National Advertisers* rule, but applying the stricter *Cinderella* standard to adjudicative facts). A subsequent panel of the D.C. Circuit did seem to call into question the *Association of National Advertisers* rule, but did so by suggesting due process should not apply at all in rulemakings. *See Natural Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 194 (D.C. Cir. 1988). It does not appear any court has rejected the *Association of National Advertisers* rule in favor of the *Cinderella* standard.

The D.C. Circuit's standard is based in part upon a pair of century-old United States Supreme Court cases that distinguished between administrative proceedings that resemble legislative action and proceedings that resemble adjudicatory action. *See Ass'n of Nat'l Advertisers*, 627 F.2d at 1165. *See generally Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 36 S. Ct. 441, 60 L. Ed. 372 (1915); *Londoner v. City and Cnty. of Denver*, 210 U.S. 373, 28 S. Ct. 708, 52 L. Ed. 1103 (1908); Arthur Earl Bonfield, *The Definition of Formal Agency Adjudication Under the Iowa Administrative Procedure Act*, 63 Iowa L. Rev. 285, 323–24 (1977) [hereinafter Bonfield] (discussing the influence of *Londoner* and *Bi-Metallic Investment Co.* on the development of administrative law). In *Londoner*, the City of Denver established an administrative scheme permitting local boards "to make local improvements and to assess the cost upon property specially benefited." 210 U.S. at 375, 28 S. Ct. at 709, 52 L. Ed. at 1108. Determining the affected landowners were entitled to a hearing, the Court reasoned:

> In the assessment, apportionment, and collection of taxes upon property within their jurisdiction, the Constitution of the United States imposes few restrictions upon the states. . . . But where the legislature of a state, instead of fixing the tax itself, commits to some subordinate body the duty of determining whether, in what amount, and upon whom it shall be levied, and of making its assessment and apportionment, due process of law requires that, at some stage of the proceedings, before the tax becomes irrevocably fixed, the taxpayer shall have an opportunity to be heard, of which he must have notice, either personal, by publication, or by a law fixing the time and place of the hearing.

*Id.* at 385–86, 28 S. Ct. at 714, 52 L. Ed. at 1112.

By contrast, in *Bi-Metallic Investment Co.*, the Colorado Tax Commission and State Board of Equalization adopted a substantial uniform tax increase. 239 U.S. at 443, 36 S. Ct. at 142, 60 L. Ed. at 374. The Court rejected the challenge without any significant pause, reasoning:

> Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Id.* at 445, 36 S. Ct. at 142, 60 L. Ed. at 375. In doing so, the Court distinguished *Londoner* as a case in which "[a] relatively small number of persons was concerned, who were exceptionally affected, in each case upon individual ground." *Id.* at 446, 36 S. Ct. at 142, 60 L. Ed. at 375. The Court continues to adhere to this well-established framework. *See generally United States v. Florida E. Coast Ry.*, 410 U.S. 224, 93 S. Ct. 810, 35 L. Ed. 2d 223 (1973); *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 92 S. Ct. 1941, 32 L. Ed. 2d 453 (1972).

Decisions by federal courts interpreting the Federal Administrative Procedure Act are persuasive in our interpretation of the IAPA. *See Iowa Citizen/Labor Energy Coal., Inc. v. Iowa State Commerce Comm'n*, 335 N.W.2d 178, 180 (Iowa 1983). Nevertheless, we think our cases already provide a foundation for crafting a distinction similar to the one made by *Ass'n of National Advertisers*. *See Geringer v. Iowa Dep't of Human Servs.*, 521 N.W.2d 730, 734 (Iowa 1994) (noting *Anstey*'s rule "must be tempered so as to harmonize with the dictates of the administrative process as established by the legislature"); *cf. Ass'n of Nat'l Advertisers*, 627 F.2d at 1166 ("[W]e must apply a disqualification standard that is consistent with the structure and purposes of [the FTC Act].").

After all, the IAPA presupposes a number of significant differences between rulemakings and contested cases. For example, the IAPA specifically prohibits ex parte communications in contested cases. Iowa Code § 17A.17(1)(*a*). Yet, the rule is silent on ex parte contacts in informal rulemakings. *See id.* This suggests the legislature was not as concerned with ex parte contacts in informal rulemakings. This conclusion is consistent with the approach taken by federal courts when determining whether ex parte agency contacts during informal rulemakings violate the Federal Administrative Procedure Act. *See Ass'n of Nat'l Advertisers*, 627 F.2d at 1169 n.39; *see also Hercules, Inc. v. EPA*, 598 F.2d 91, 124–25 (D.C. Cir. 1978) (holding intra-agency contacts during an informal rulemaking do not violate the Federal Administrative Procedure Act); *Home Box Office*, 567 F.2d at 57 ("[W]e recognize that informal contacts between agencies and the public are the 'bread and butter' of the process of administration and are completely appropriate

so long as they do not frustrate judicial review or raise serious questions of fairness.").[4]

Chapter 17A similarly provides a disqualification standard for administrators acting in contested cases but not informal rulemakings. *See* Iowa Code § 17A.11(2). The absence of a statutory standard for disqualification in the rulemaking context is instructive. *See Ass'n of Nat'l Advertisers*, 627 F.2d at 1169 n.39 (discussing differences in processes between rulemaking and adjudication). Section 17A.2(5) indicates a contested case is any administrative action "in which the legal rights, duties or privileges of a party *are required by Constitution or statute* to be determined by an agency after an opportunity for an *evidentiary hearing.*" Iowa Code § 17A.2(5) (emphasis added). The common thread tying contested cases together in the due process context—a fair tribunal—is only truly necessary because of the function of determining adjudicative facts. *Hollinrake v. Iowa Law Enforcement Acad.*, 452 N.W.2d 598, 602 (Iowa 1990); Bonfield, 63 Iowa L. Rev. at 323–24. Adjudicative facts "concern[] immediate parties," Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. 364, 402 (1942) [hereinafter Davis], and "the facts of the particular case," Bonfield, 63 Iowa L. Rev. at 323. In contrast, when an agency implements statutory policy and acts legislatively, it considers "legislative facts," which do not concern the immediate parties but society as a whole, Davis, 55 Harv. L. Rev. at 402–04, and for which an evidentiary hearing is generally unnecessary, *see* Bonfield, 63 Iowa L.

---

[4]While *Home Box Office* expresses limits on this principle, a subsequent panel backed away from its proposed limits. *See Action for Children's Television v. FCC*, 564 F.2d 458, 477–78 (D.C. Cir. 1977); *see also Ass'n of Nat'l Advertisers*, 627 F.2d at 1169 n.40 (discussing the relationship between *Home Box Office* and *Action for Children's Television*).

Rev. at 325. Adjudicative facts play no role in an informal rulemaking, making a hearing unnecessary. *See Ass'n of Nat'l Advertisers*, 627 F.2d at 1161–62. Neither the United States or Iowa Constitutions nor any statute requires the Commission hold a formal evidentiary hearing on the record before adopting a rule.

In this regard, chapter 17A suggests a virtual absence of due process in the context of rulemakings. *See Greenwood Manor*, 641 N.W.2d at 834 ("The importance of the distinction between the categories [of agency action] lies in the due process afforded to parties involved in contested case proceedings."); *Polk County v. Iowa State Appeal Bd.*, 330 N.W.2d 267, 276 (Iowa 1983) (same); *Lunde v. Iowa Bd. of Regents*, 487 N.W.2d 357, 359 (Iowa Ct. App. 1992) (" 'Other agency action' entitles the person affected to no more than an informal hearing, without the procedural due process safeguards inherent in an adversarial proceeding."). Federal law is in accord. *See Ass'n of Nat'l Advertisers*, 627 F.2d at 1165–66 ("When a proceeding is classified as a rulemaking, due process ordinarily does not demand procedures more rigorous than those provided by Congress."); *see also Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524, 98 S. Ct. 1197, 1202, 55 L. Ed. 2d 460, 467 (1978) (stating the Federal Administrative Procedure Act's informal rulemaking procedures contained in 5 U.S.C. § 553 establish "the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures").

In this case, the Commission acts under a delegation of authority from the legislature, *see* Iowa Code § 455A.6(6), which from a theoretical standpoint the Commission shares with the Governor, *see* Iowa Const. art. IV, § 1 (vesting "supreme executive authority" in the Governor); *id.*

art. IV, § 9 (providing that the Governor "shall take care that the laws are faithfully executed"). As a consequence, section 455A.6 represents a broad mandate of authority to the Commission, which oversees overwhelming complex and technical subject matter. This, of course, is consonant with one obvious, general purpose of administrative agencies within the modern regulatory state: the subjects of regulation are justifiably numerous and complex, and the importance of an administrator's legal, technical, and scientific expertise cannot be understated. The commissioners are not mere functionaries of the legislative will; rather, they are executive officers who exercise sound discretion within the policy-making guidelines the legislature has provided them. Accordingly, it is understandable the Governor (and the Iowa Senate, which unanimously confirmed Heathcote based on her outstanding credentials) would have viewed the expertise Heathcote could bring to the antidegradation policy rulemaking as indispensable. *See Ass'n of Nat'l Advertisers*, 627 F.2d at 1168 ("Rulemaking involves the kind of issues 'where a month of experience will be worth a year of hearings.'" (quoting *Am. Airlines, Inc. v. Civil Aeronautics Bd.*, 359 F.2d 624, 633 (D.C. Cir. 1966))).

Similarly, we cannot forget that the legislature, like Congress, "is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers." *Yakus v. United States*, 321 U.S. 414, 425–26, 64 S. Ct. 660, 668, 88 L. Ed. 834, 849 (1944). On the contrary, the discretion can be quite significant so long as an "intelligible principle" exists to guide its exercise. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474, 476, 121 S. Ct. 903, 913, 914, 149 L. Ed. 2d 1, 17, 18 (2001) (holding the EPA could regulate air pollutants under the Clean Air Act solely on the basis of the

pollutant's risk to human health). Finally, the Iowa Constitution also contains a provision permitting the legislature to nullify an administrative rule "by the passage of a resolution by a majority of all of the members of each house of the general assembly." Iowa Const. art. III, § 40; *see also* Jerry L. Anderson & Christopher Poynor, *A Constitutional and Empirical Analysis of Iowa's Administrative Rules Review Committee Procedure*, 61 Drake L. Rev. 1, 64 (2012) (describing the legislature's authority to nullify rules under article III, section 40).

We recognize, however, as the D.C. Circuit did, that some limited conception of due process should accompany informal rulemaking. We understand that meaningful judicial review requires some narrow opportunity to challenge an administrator for bias. We note, of course, a commissioner acting in a rulemaking "is presumed to be objective and 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *United Steelworkers*, 647 F.2d at 1208 (quoting *Morgan*, 313 U.S. at 421, 61 S. Ct. at 1004, 85 L. Ed. at 1435). Yet, the appropriate inquiry does not center merely on whether a disinterested observer could conclude an administrator acting in a rulemaking had in some measure prejudged the merits of the proposed quasi-legislative action. Placing the Commission and its commissioners—and the rulemaking in this case—in the proper context, we think a district court may vacate a rulemaking on the ground of bias upon no less than a showing by clear and convincing evidence that the administrator has undertaken the agency action with an "unalterably closed mind," thereby making their action "motivated by an improper purpose." *See Ass'n of Nat'l Advertisers*, 627 F.2d at 1170.

"This showing should focus on the agency member's prejudgment, if any, rather than a failure to weigh the issues fairly." *C & W Fish Co.,*

931 F.2d at 1564. The showing should essentially demonstrate the administrator was so predisposed to one position that they were "unwilling to consider arguments to the contrary." *PLMRS Narrowband*, 182 F.3d at 1002. Therefore, "[a]gencies are required to consider in good faith, and to objectively evaluate, arguments presented to them; agency officials, however, need not be subjectively impartial." *Carolina Env'tl Study Grp. v. United States*, 510 F.2d 796, 801 (D.C. Cir. 1975); *accord United Steelworkers*, 647 F.2d at 1209. After all, "[a]gency decisionmakers are appointed precisely to implement statutory programs, and so inevitably have some policy preconceptions." *Lead Indus. Ass'n*, 647 F.2d at 1179. Thus, even favoring a specific rule over another is not a basis for disqualification absent evidence that the administrator's view "could not be changed by the rulemaking proceedings that were to follow." *Consumers Union*, 801 F.2d at 427.

Indeed, environmental statutes themselves often presume a certain amount of institutional bias. *See Env'tl Def. Fund v. Corps of Eng'rs*, 470 F.2d 289, 295 (8th Cir. 1972) ("[W]e do not agree with the view implicit in the contentions of appellants that [the National Environmental Policy Act] requires agency officials to be subjectively impartial."). Far from being neutral and dispassionate regarding preservation of our environment, a commissioner is *expected* to have a position in favor of expanding environmental protections in all forms:

> "A Trade Commissioner should not be neutral on anti-monopoly policies, and a Securities and Exchange Commissioner should not be apathetic about the need for governmental restrictions.
>
> The theoretically ideal administrator is one whose broad point of view is in general agreement with the policies he administers."

*Lead Indus. Ass'n*, 647 F.2d at 1179 (quoting Kenneth Culp Davis, *Administrative Law Text* § 12.01, at 247 (3d ed. 1972)).  While extreme singlemindedness in favor of a position that makes an administrator "totally incapable of giving fair consideration to the issues that are presented for decision" is likely unacceptable, participating in a rulemaking with a preexisting policy position is well within the ambit of permissible conduct, absent clear and convincing evidence to the contrary.  *See id.* at 1179, 1180; *PLMRS Narrowband*, 182 F.3d at 1002 (distinguishing an administrator's "unalterable prejudgment" and "legitimate policy preconceptions").

Turning to the facts of this case, Farm Bureau emphasizes Heathcote's preexisting support for and advocacy of a robust antidegradation policy.  Indeed, at all times during the rulemaking proceedings, Farm Bureau argues, Heathcote actively advocated for the antidegradation policy's adoption.  It bolsters this argument by pointing out a number of similarities between the Iowa Environmental Council's proposed rule, which Heathcote helped draft, and the final rule adopted by the Commission.  Farm Bureau also maintains Heathcote's salary was a factor—asserting Heathcote's job duties included "paid advocacy" and likening her to a lobbyist.

We observe that a similar challenge was rejected in *Lead Industries Association*.  *See* 647 F.2d at 1174–80.  In that case, an EPA administrator had previously worked as an attorney with the Natural Resources Defense Council in a suit seeking to compel the EPA to list lead as a hazardous air pollutant under the Clean Air Act.  *Id.* at 1172. *See generally Natural Res. Def. Council, Inc. v. Train*, 545 F.2d 320 (2d Cir. 1976).  After the EPA was required to list lead as an air pollutant, the administrator joined the EPA's staff and participated in the

subsequent rulemaking that listed lead as a pollutant and prescribed the maximum amounts of acceptable lead pollution in the atmosphere. *Lead Indus. Ass'n*, 647 F.2d at 1172. The court rejected the Lead Industry Association's challenge to the rules based on the administrator's participation.

The court observed that no other court had ever—under any standard—disqualified an administrator from participating in an informal rulemaking proceeding on the basis of policy bias. *Id.* at 1179. The court concluded that "under the prejudgment test for rulemaking in [*Association of National Advertisers*] . . . there can be no question but that [the administrator's] disqualification from the lead standards rulemaking is unwarranted." *Id.* at 1180.

Here, evidence supports a conclusion that Commissioner Heathcote had a preconceived position about the value of a muscular antidegradation policy. As Farm Bureau points out, she was involved in drafting policy for the Iowa Environmental Council and was instrumental in drafting the 2007 rulemaking petition. We also agree that the final rule adopted by the Commission was similar in some key aspects to the proposed rule by the Iowa Environmental Council. Nevertheless, the similarities or differences are not evidence of bias. *See Consumers Union*, 801 F.2d at 427. Likewise, Farm Bureau has failed to proffer clear and convincing evidence of an unalterably closed mind.

We recognize factual distinctions exist between this case and *Lead Industries Association*. First, Heathcote's participation both in crafting the policy before being nominated to the Commission and during the rulemaking proceedings was likely greater than the administrator's in *Lead Industries Association*. *See* 647 F.2d at 1174. While the D.C. Circuit commented on the lack of evidence demonstrating any outside

influence by the administrator, it proceeded to emphasize that as an official expected to implement a policy for the executive, he was not expected to be—and ideally should not be—neutral from a policy standpoint. *See id.* at 1177–79. Of course, it does not seem the scope of influence the challenged administrator had over a rule has ever been dispositive. The challenged administrator in *C & W Fish Co.* had a considerable impact on the rulemaking proceedings, but the D.C. Circuit held his participation was not improper. *See* 931 F.2d at 1559, 1564–65.

Second, and perhaps more importantly, Heathcote continued her employment with the Iowa Environmental Council. Yet, we are not persuaded that this would be a dispositive distinction. The Commission contains built-in policy conflicts of interest. The statute provides five of the nine commissioners *must* be actively engaged in or employed in—and thereby presumably *represent*—certain industries that might conceivably be subject to regulation by the Commission. *See* Iowa Code § 455A.6(1). It would be anomalous to conclude that the other four commissioners would not similarly be expected to bring with them both policy experience and preconceived policy positions. To paraphrase Justice Rehnquist: Susan Heathcote's years of experience and continued employment as Water Policy Director for the Iowa Environmental Council are the source of indispensable qualifications, not the source of disqualifying bias. *See Laird v. Tatum*, 409 U.S. 824, 835, 93 S. Ct. 7, 13–14, 34 L. Ed. 2d 50, 59 (1972).

Accordingly, we hold Commissioner Heathcote's employment with the Iowa Environmental Council—including her job duties of policy research and advocacy—do not require us to vacate the antidegradation policy. The process of rulemaking simply does not give rise to the standard of disqualification urged by Farm Bureau.

### V. Disqualification of Commissioner La Seur.

The Commission concedes La Seur was not an eligible elector on December 15, 2009, when the Commission voted to adopt the antidegradation policy.[5] Nonetheless, the Commission argues Iowa's long-standing de facto officer doctrine validates the Commission's action despite the failure of La Seur to qualify for office after she moved. Farm Bureau responds the de facto officer doctrine is not without limit and does not apply in this case. In the alternative, Farm Bureau asserts the de facto officer doctrine was superseded by the 1998 IAPA amendments. Specifically, Farm Bureau contends the doctrine is incompatible with the amended form of section 17A.19(10)(*e*).

**A. De Facto Officer Doctrine.** The de facto officer doctrine validates official action taken without legal authority by giving authority to an official who lacks de jure authority to take official action. *See Allen v. State*, 528 N.W.2d 583, 588 (Iowa 1995). In other words, "the acts of a *de facto* officer are valid as to the public and third persons." *Waite v. City of Santa Cruz*, 184 U.S. 302, 322, 22 S. Ct. 327, 334, 46 L. Ed. 552, 566 (1902). The de facto officer doctrine has been a key stitch in the fabric of our common law since our earliest days of statehood. *See State ex rel. Rice v. Cnty. Judge*, 7 Iowa (7 Clarke) 186, 195 (1858). It has "ancient origin," *Herbst v. Held*, 194 Iowa 679, 684, 190 N.W. 153, 155 (1922), dating at least to an early English common law case called *The Abbé of Fountaine*, Y.B. 9 Hen. 6, f. 32, pl. 3 (1431), *see State v. Carroll*, 38 Conn. 449, 458 (1871) (tracing the history of the doctrine through English common law). Over time, the doctrine has achieved "practically

---

[5]Because the Commission concedes La Seur's lack of qualifications, we need not decide whether she was actually an "elector" at the time the Commission voted to adopt the antidegradation policy.

universal acceptance by the courts." *Herbst*, 194 Iowa at 684, 190 N.W. at 155. We applied this ancient doctrine as recently as 1997. *See City of Windsor Heights v. Spanos*, 572 N.W.2d 591, 593–94 (Iowa 1997).

At its core, the doctrine limits the ability of a plaintiff "to challenge governmental action on the ground that the officers taking that action are improperly in office." *Andrade v. Lauer*, 729 F.2d 1475, 1493–94 (D.C. Cir. 1984). It operates in a way that

> distinguishes between "collateral" attacks, in which plaintiffs attack government action on the ground that the officials who took the action were improperly in office, and "direct" attacks, in which plaintiffs attack the qualifications of the officer, rather than the actions taken by the officer.

*Id.* at 1496.[6] Under the doctrine, the legality of the officer's qualifications to hold office cannot be attacked collaterally as a means of invalidating

---

[6]The distinction the de facto officer doctrine draws is itself distinct from the more commonly used meanings of "direct" and "collateral," as used, for instance, in the context of whether a new constitutional rule applies retroactively. *See, e.g.*, *State v. Ragland*, 836 N.W.2d 107, 114 (Iowa 2013); *Perez v. State*, 816 N.W.2d 354, 358 (Iowa 2012). As used in the retroactivity inquiry, the terms distinguish between direct appeals from an initial conviction or proposed application of a new constitutional rule in a postconviction relief action, which by definition occurs when the underlying conviction is "final." *Perez*, 816 N.W.2d at 358. In other words, the direct–collateral distinction ordinarily refers to when and in what proceeding a challenge may be brought. The same is basically true in the context of a collateral attack on a court's exercise of personal jurisdiction over a civil defendant, although the distinction contemplates different fora. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706, 102 S. Ct. 2099, 2106, 72 L. Ed. 2d 492, 504 (1982) ("A defendant is always free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding.").

In contrast, the direct–collateral distinction in the context of the de facto officer doctrine refers to the object of the attack—the officer's qualifications to hold office or the official action that is the result of the officer's actions. In other words, instead of the "when" or "where" of a challenge, the direct–collateral distinction focuses in the de facto officer context on the "what" of the petitioner's challenge. In *Windsor Heights*, for example, we applied the de facto officer doctrine to a challenge to the authority of the city attorney to prosecute a traffic case on direct review from the defendant's conviction. 572 N.W.2d at 593–94. As we discuss below, challenges to official qualifications are permitted through a narrow procedural framework that closely circumscribes the types of persons who may bring an action. *See* Iowa R. Civ. P. 1.1302. In this regard, the direct–collateral distinction also contemplates the "who" of a challenge in addition to the

their official actions. *Keeney v. Leas*, 14 Iowa 464, 469 (1863); *see also Nat'l Ass'n of Greeting Card Publishers v. U.S. Postal Serv.*, 569 F.2d 570, 579 (D.C. Cir. 1976) ("In short, the remedy for improper composition is not invalidation of the Commission's action through indirect challenge, but rather removal of the allegedly disqualified Commissioner by way of direct attack."), *vacated on other grounds by* 434 U.S. 884, 98 S. Ct. 253, 54 L. Ed. 2d 169 (1977). The doctrine is based on necessity and seeks to protect the public by sustaining the orderly functions of government despite some defect in the qualifications of an officer. *Windsor Heights*, 572 N.W.2d at 593; *accord State v. Driscoll*, 455 N.W.2d 916, 917 (Iowa 1990); *Buck v. Hawley & Hoops*, 129 Iowa 406, 409, 105 N.W. 688, 689 (1906). Clearly, the doctrine adopts a practical approach to an infrequent problem. We have also observed that the de facto officer doctrine "is consistent with the broader rule that presumes the validity of official agency actions." *Allen*, 528 N.W.2d at 588; *see also Teleconnect Co. v. Iowa State Commerce Comm'n*, 404 N.W.2d 158, 162 (Iowa 1987) ("An agency rule is presumed valid and the burden is on the party challenging it to demonstrate that a 'rational agency' could not conclude the rule was within the agency's delegated authority."). The United States Supreme Court has explained that the public and third parties "are not required to investigate" the officer's title and "may safely act upon the assumption" that the officer is legally in office. *Waite*, 184 U.S. at 323, 22 S. Ct. at 334, 46 L. Ed. at 566. After all, citizens have a right "to accept the law as it is written" and are not "required to determine its

---

"what." Consequently, the fact that the IAPA permits direct review of administrative action, *see* Iowa Code § 17A.19, is immaterial. The point of our holding today is that Farm Bureau did not fit its challenge within the narrow parameters that permit a court to set aside agency action on the ground that the officer did not lawfully hold perfect title to office.

validity." *Lang v. City of Bayonne*, 68 A. 90, 92 (N.J. 1907). Just as citizens do not make the law, they should not bear the responsibility of determining its validity. *See id.* "It is manifest that endless confusion would result if in every proceeding before such officers their title could be called in question." *Norton v. Shelby County*, 118 U.S. 425, 442, 6 S. Ct. 1121, 1125, 30 L. Ed. 178, 186 (1886).

Moreover, "the doctrine gives no weight to the public interest in enforcing legal norms concerning eligibility and appointment to office and individuals' interests in having the government act against them only through lawfully appointed agents." *Andrade*, 729 F.2d at 1497. It "assumes that an individual suffers no judicially cognizable injury when he is the subject of adverse governmental action that is legitimate in all respects save that the official taking the action lacks lawful title to office." Kathryn A. Clokey, Note, *The De Facto Officer Doctrine: The Case for Continued Application*, 85 Colum. L. Rev. 1121, 1122 (1985) [hereinafter Clokey]; *see also Hussey v. Smith*, 99 U.S. (9 Otto) 20, 24, 25 L. Ed. 314, 315 (1878) ("The acts of [de facto] officers are held to be valid because the public good requires it. The principle wrongs no one."). *But see Ryder v. United States*, 515 U.S. 177, 182–83, 115 S. Ct. 2031, 2035, 132 L. Ed. 2d 136, 143 (1995) (holding an individual who makes a timely challenge to a judicial officer based on the Appointments Clause is entitled to a determination of the merits of his claim).

The doctrine "applies where a *qualified* official, by *technical infirmity*, does not validly hold the official position." *Windsor Heights*, 572 N.W.2d at 593–94.

> In order to support the acts of one on the ground that he is a *de facto* officer, they must be done under color of the office, the duties of which must have been assumed and discharged by the person claiming to fill the office.

*Bailey v. Fisher*, 38 Iowa 229, 231 (1874). There must be a de jure office in order for the court to find the officer to be one de facto. *Town of Decorah v. Bullis*, 25 Iowa 12, 18 (1868); *accord Norton*, 118 U.S. at 441, 6 S. Ct. at 1125, 30 L. Ed. at 186 ("[T]here can be no officer, either *de jure* or *de facto*, if there be no office to fill."). The duties performed by the de facto officer must also be within the powers of the office. *See Bailey*, 38 Iowa at 231. Early cases assumed color of appointment or election was also a necessary element of the doctrine's application. *See Herkimer v. Keeler*, 109 Iowa 680, 683, 81 N.W. 178, 179 (1899); *Carroll*, 38 Conn. at 471–72. Yet, we later held an appointment or election establishing color of title is not indispensable. *Buck*, 129 Iowa at 409, 105 N.W. at 689.

In the past, we have applied the doctrine to a variety of defects in official title. Some instances in which we have applied the doctrine have surely been minor technical infirmities of those who otherwise clearly had color of title to their office. *See State v. Sheets*, 291 N.W.2d 35, 37 (Iowa 1980) (applying the doctrine to a county attorney who, following election to the office, failed to submit a written oath with his bond); *Bd. of Dirs. v. Cnty. Bd. of Educ.*, 257 Iowa 106, 112, 131 N.W.2d 802, 806 (1964) [hereinafter *Grimes Indep. Sch. Dist.*] (applying the doctrine to members of the board of directors of a school district who performed three years of board functions before being sworn in as required by statute); *State ex rel. Hartnett v. Powell*, 101 Iowa 382, 385–86, 70 N.W. 592, 593 (1897) (applying the doctrine to school board directors who took a required oath from a person not legally authorized to administer the oath); *Wheeler & Wilson Mfg. Co. v. Sterrett*, 94 Iowa 158, 159, 62 N.W. 675, 675–76 (1895) (applying the doctrine to a deputy county clerk who had been appointed by the clerk, but the board of supervisors had not

approved the appointment, and the deputy had not given bond required by statute); *State ex rel. Rice*, 7 Iowa (7 Clarke) at 195 (applying the doctrine to ex officio judges of election results who had failed to take the statutorily required oath).

In each of these cases, the application of the doctrine was obvious. Yet, we have never downplayed the importance of the requisite qualification for officials to act. For example, we have not ignored the importance of officials taking the oath of office. *See Grimes Indep. Sch. Dist.*, 257 Iowa at 113, 131 N.W.2d at 806; *State ex rel. Hartnett*, 101 Iowa at 386, 70 N.W. at 593. To the contrary, we have stressed the necessity and justice of the doctrine's application on behalf of the public and third parties. *See Grimes Indep. Sch. Dist.*, 257 Iowa at 113, 131 N.W.2d at 806.

We have also applied the doctrine to more serious errors in election or appointment. *See State v. Cent. States Elec. Co.*, 238 Iowa 801, 818, 28 N.W.2d 457, 466 (1947) (applying the doctrine to a mayor and city councilman who accepted positions as trustees contended to be incompatible with their municipal offices); *Cowles v. Indep. Sch. Dist.*, 204 Iowa 689, 698–99, 216 N.W. 83, 87–88 (1927) (applying the doctrine to two school board members appointed to fill the vacancies of two current school board members who had already resigned, thereby technically depriving the board of a quorum); *Metro. Nat'l Bank v. Commercial State Bank*, 104 Iowa 682, 687, 74 N.W. 26, 28 (1898) (applying the doctrine to a clerk of court who accepted a position as receiver for a bank in insolvency proceedings before the court at which he worked, allegedly disqualifying him from continuing to serve as clerk). Some of these cases suggest the specter of a lurking conflict of interest between incompatible positions. *See, e.g., Cent. States Elec. Co.*, 238

Iowa at 818, 28 N.W.2d at 466; *Metro. Nat'l Bank*, 104 Iowa at 687, 74 N.W. at 28. We also applied the doctrine to a peace officer who had failed to undergo a statutorily required psychological evaluation. *Driscoll*, 455 N.W.2d at 918.

Furthermore, we have opined that the doctrine *could* validate the acts of a quasi-official when the public relied on the official's consistent assertions of authority. *See Buck*, 129 Iowa at 408–09, 105 N.W. at 689. Additionally, we have even applied the doctrine to factual situations in which an officer's lack of lawful title to office arguably implicated larger concerns, such as due process. *See Windsor Heights*, 572 N.W.2d at 593–94 (applying the doctrine to a city attorney who did not actually have contractual authority to prosecute a traffic violation occurring in a neighboring city under chapter 32B, which allows political subdivisions to contract with each other for the performance of governmental services for mutual advantage); *Allen*, 528 N.W.2d at 588 (applying the doctrine to appeals committee members who were appointed by the director of the department of personnel in violation of a statute requiring appointment by the personnel commission); *Koss v. City of Cedar Rapids*, 271 N.W.2d 730, 737 (Iowa 1978) (applying the doctrine to a district judge whose term as assistant chief judge, and thus whose authority to appoint a district associate judge in a condemnation proceeding, had expired).

Similarly, federal courts have applied the doctrine to pure challenges to the constitutional propriety of an appointment or what has been called attempts to "enforc[e] legal norms concerning eligibility and appointment to office." *Andrade*, 729 F.2d at 1497. For example, the United States Supreme Court validated all pre-1976 actions by the Federal Election Commission, even though its members were appointed unconstitutionally in violation of the Appointments Clause of Article II,

Section 2, Clause 2. *Buckley v. Valeo*, 424 U.S. 1, 142–43, 96 S. Ct. 612, 693, 46 L. Ed. 2d 659, 758 (1976), *superseded by statute on other grounds as recognized in McConnell v. FEC*, 540 U.S. 93, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003). Perhaps most dramatically, the United States Supreme Court applied the doctrine to the actions of the insurrectionist government of civil-war-era Texas. *See Texas v. White*, 74 U.S. (7 Wall.) 700, 732–33, 19 L. Ed. 227, 240 (1868). These dramatic applications of the de facto officer doctrine are possible in part because courts are cognizant of what the consequences of declaring a government actor without power entails. *Cf. Luther v. Borden*, 48 U.S. (7 How.) 1, 38–39, 12 L. Ed. 581, 597–98 (1849) (applying the political question doctrine to the martial law used by the charter government of Rhode Island during the Dorr Rebellion in part because of the consequences associated with effectively declaring one proffered government illegal). The *Luther* Court reasoned:

> [T]he question presented is certainly a very serious one: For, if this court is authorized to enter upon this inquiry as proposed by the plaintiff, and it should be decided that the charter government had no legal existence during the period of time above mentioned,—if it had been annulled by the adoption of the opposing government,—then the laws passed by its legislature during that time were nullities; its taxes wrongfully collected; its salaries and compensation to its officers illegally paid; its public accounts improperly settled; and the judgments and sentences of its courts in civil and criminal cases null and void, and the officers who carried their decisions into operation answerable as trespassers, if not in some cases as criminals.

*Id.* at 38–39, 12 L. Ed. at 597.

Historical application of the doctrine—both inside and outside of this state—reveals it is not uniquely reserved for mere minor oversights. As Judge Learned Hand commented, "It is not wholly clear how far the conditions upon a[n] [official's] qualifications may be absent and his acts

still be immune from collateral attack." *Johnson v. Manhattan Ry.*, 61 F.2d 934, 938 (2d Cir. 1932).

However, the doctrine has its limits. For example, we have recognized it does not apply to a third person who "is chargeable with the knowledge of the defect in the title of a claimed officer to his office." *Heyland v. Wayne Indep. Sch. Dist. No. 5*, 231 Iowa 1310, 1314, 4 N.W.2d 278, 280 (1942); *accord Herkimer*, 109 Iowa at 684, 81 N.W. at 179; *State v. Mayor of Jersey City*, 44 A. 709, 712 (N.J. 1899). The "appearance of right is the essence of a de facto officer's authority, [and] '[i]f an official's claim to office is known to be unlawful, the notoriety of his title defect prevents a finding of color of authority.'" *Sierra Club v. Castle & Cooke Homes Hawai'i, Inc.*, 320 P.3d 849, 865 (Haw. 2013) (quoting Clokey, 85 Colum. L. Rev. at 1123). If the defect in the authority of a public official was known to the public, then the doctrine does not apply. *See id.* at 868. Nevertheless, in this case, there was no allegation that La Seur's lack of elector status was notorious during the time the Commission considered and approved the antidegradation policy.[7]

A very important factor in the application of the de facto officer doctrine can be drawn from two cases we decided involving peace officers who had arrested persons for the crime of operating a motor vehicle while

---

[7]Of course, La Seur herself might have been put on notice that she lost her elector status by registering to vote in Montana. *See Millwright v. Romer*, 322 N.W.2d 30, 33 (Iowa 1982) ("Every citizen is assumed to know the law and is charged with knowledge of the provisions of statutes."). However,

> [s]ince the primary purpose of the doctrine is to protect the public and the government agencies which act in reliance on the validity of an officer's actions, the fact that the officer himself knew or should have known that he lacked official authority would not be dispositive of the issue. More directly pertinent is the appearance to others at the time.

*EEOC v. Sears, Roebuck & Co.*, 650 F.2d 14, 18 (2d Cir. 1981).

intoxicated prior to the time they had completed all the required law enforcement training. In *State v. Palmer,* we held a peace officer who had not completed the required statutory course of instruction relating to the processing of drivers suspected of operating a motor vehicle while intoxicated was not a de facto officer for purposes of invoking the implied-consent statute. 554 N.W.2d 859, 864–65 (Iowa 1996); *see also* Iowa Code § 321J.1(7) (1995) (defining "peace officer" to include "[a]ny other law enforcement officer who has satisfactorily completed an approved course relating to motor vehicle operators under the influence of alcoholic beverages at the Iowa law enforcement academy or a law enforcement training program approved by the department of public safety"). The de facto officer doctrine did not apply to validate the invocation of the implied-consent procedures because the lack of qualifications went "to the heart of section 321J.1(7)(*e*)." *Palmer,* 554 N.W.2d at 865. In other words, the peace officer was not " '*otherwise trained for and certified to administer the test.*' " *Id.* (quoting *Driscoll,* 455 N.W.2d at 918).

In contrast, in *Driscoll,* a peace officer had completed the required implied-consent training, but had not yet completed a psychological evaluation required for all peace officers prior to employment. 455 N.W.2d at 917–18. We held the de facto officer doctrine applied to validate the administration of the blood-alcohol test by the officer because the disqualification at issue did not undermine the ability of the officer to properly administer the test and protect the public from being subjected to inaccurate and indiscriminate testing. *See id.* at 918.

These two cases make it very clear that the de facto officer doctrine is not applied when the particular disqualification at issue undermines the integrity and confidence demanded in actions taken or decisions

made by government.  *See* Clokey, 85 Colum. L. Rev. at 1135 ("Although the de facto officer doctrine generally denies individuals an interest in enforcing title requirements, the doctrine should not apply when a qualification for specific office aims to protect the individuals subject to that official's authority.").  In *Palmer,* the lack of qualifications threatened the basic objective of the implied-consent procedures, but the lack of qualifications in *Driscoll* did not.  When the disqualification does not undermine the integrity and confidence of the action taken or the decision made by government, it would be contrary to the public good to allow the action to be collaterally attacked.  *Driscoll,* 455 N.W.2d at 918.  This distinction is critical to the ultimate resolution in this case.

This approach is also consistent with the approach taken by other courts and commentators.  One commentator has said:

> When a court considers a collateral title challenge, it should discern the policies embodied in the particular requisite to office and determine whether they are designed to protect the interests of individuals appearing before such officers or to protect the administration of government.

*See* Clokey, 85 Colum. L. Rev. at 1138.  Other courts follow this model.  *See Fair Political Practices Comm'n v. Californians Against Corruption,* 134 Cal. Rptr. 2d 659, 665 (Ct. App. 2003); *Daniels v. Indus. Comm'n,* 775 N.E.2d 936, 940 (Ill. 2002) (plurality opinion); *id.* at 946 (McMorrow, J., specially concurring); *In re Fichner,* 677 A.2d 201, 206–07 (N.J. 1996).

This approach also resembles the rule of the United States Supreme Court decision in *Glidden Co. v. Zdanok,* which indicated the de facto officer rule did not apply when the qualification for an officer embodied "a strong public policy" concerning the proper administration of government or was "based upon nonfrivolous constitutional grounds." 370 U.S. 530, 535–36, 82 S. Ct. 1459, 1465, 8 L. Ed. 2d 671, 678–79

(1962) (plurality opinion). A similar reason can be found in *American Construction Co. v. Jacksonville, Tampa & Key West Railway*, 148 U.S. 372, 387–88, 13 S. Ct. 758, 764–65, 37 L. Ed. 486, 492 (1893), although the de facto doctrine was not specifically identified. In that case, a statute prohibited a judge whose order was before the court of appeals from sitting on the panel reviewing the order. *Id.* at 387, 13 S. Ct. at 764, 37 L. Ed. at 492; *see* Circuit Court of Appeals Act of 1891, ch. 517, § 3, 26 Stat. 826, 827 (1891) ("[N]o justice or judge, before who a cause or question may have been tried or heard in a district court . . . shall sit on the trial or hearing of such cause or question in the circuit court of appeals."); *see also* 28 U.S.C. § 47 (2012) ("No judge shall hear or determine an appeal from the decision of a case or issue tried by him."). Without mentioning the doctrine, the Court reasoned:

> If the statute made him incompetent to sit at the hearing, the decree in which he took part was unlawful, and perhaps absolutely void, and should certainly be set aside or quashed by any court having authority to review it by appeal, error, or certiorari.

*Am. Constr. Co.*, 148 U.S. at 387, 13 S. Ct. at 764, 37 L. Ed. at 492.

> Similarly, the Supreme Court has held:

> [O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred.

*Ryder*, 515 U.S. at 182–83, 115 S. Ct. at 2035, 132 L. Ed. 2d at 143. The Court explained, "Any other rule would create a disincentive to raise Appointments Clause challenges with respect to questionable judicial appointments." *Id.* at 183, 115 S. Ct. at 2035, 132 L. Ed. 2d at 143.

In this case, it is difficult to discern with precision the underlying objective or policy the legislature had in mind in imposing the

requirement for commissioners to be electors. The legislature could have wanted Commission members to be electors in order to help determine with greater accuracy the required political balance for the Commission, to help ensure members were engaged Iowa citizens, in order to help ensure members were connected by residency to Iowa, or other reasons. Overall, the reasonableness of the requirement is likely derived from the perspective that the state would not want Commission members with little or no contact to the state making rules governing Iowans. Thus, it is reasonable to view the purpose of the requirement as consistent with this perspective. Nevertheless, there is nothing to suggest the elector requirement was designed to protect individuals who may be subjected to the authority of a public official or to protect the orderly administration of government.

Importantly, La Seur was an elector when appointed to the Commission. This is important because the policy of the requirement was clearly satisfied in the inception. While La Seur subsequently lost her status as an elector when she moved from the state, the move did not totally undermine the objectives of the requirement that were initially met. The move did not eviscerate her background and qualifications. Moreover, the challenged vote cast by La Seur occurred only five months after she left Iowa, and the vote took place at a time when she still owned a home in Iowa. It is very difficult to see, in reality, how La Seur was less fit to consider the rule adopted by the Commission five months after she left the state when she continued to participate in every Commission hearing in person or by telephone. The facts of this case fall well short of those in *Palmer,* in which the officer was never properly trained to perform the task at issue in the first place and the purpose of the

statutory qualifications were undermined by the failure to qualify. Instead, the facts fit more with *Driscoll.*

It is also important to keep in mind that the qualifications to be an elector do not exist for the benefit of an individual or to protect an individual from the authority of a public officer. Additionally, the case does not implicate any constitutional challenge. The Commission serves all Iowans and the action sought to be declared invalid by Farm Bureau would affect all Iowans. The very purpose of the de facto officer doctrine is to ensure the orderly function of government despite defects in the qualifications of an officer when the defects are minor or technical. *Ryder,* 515 U.S. at 180–81, 115 S. Ct. at 2034, 132 L. Ed. 2d at 142. We think the public policy of this state requires the vote cast by La Seur five years ago to approve the rules be considered valid today, and we decline to undo all that has been done because she was not an elector at the time of the vote. Under all the circumstances, there is a stronger public policy to maintain the orderly functioning of government than the policy to undo the process of government based on a defect.

In truth, the public policy behind the de facto officer doctrine is found throughout government. For example, in the area of criminal prosecution, we do not reverse a conviction in a criminal case on appeal merely because a legal error occurred at trial. *See State v. Peterson,* 663 N.W.2d 417, 430 (Iowa 2003). If we did not take this practical approach to the operation of government, chaos and uncertainty could prevail. To err is human, and errors in the process of government that are nonprejudicial and technical in nature should not require government action predicated on that error to be undone.

The situation presented in this case is comparable to that of an elected official who fails to properly take the oath of office. For 150

years, we have rejected every claim that government action must be invalidated when an official failed to properly take the oath of office. *See Sheets*, 291 N.W.2d at 37 (dealing with a county attorney who failed to submit a written oath); *Grimes Indep. Sch. Dist.*, 257 Iowa at 112, 131 N.W.2d at 806 (concerning school board members who did not take the oath); *State ex rel. Hartnett*, 101 Iowa at 386, 70 N.W. at 593 (dealing with school board members who took oath of office from an individual not authorized to administer it); *State ex rel. Rice*, 7 Iowa (7 Clarke) at 195 (dealing with ex officio judges of election results who failed to take the statutorily required oath). The oath of office is a fundamental requirement, but it does not otherwise undermine action taken by an official who failed to properly take the oath if the official otherwise understood the duties of the office and the requirements to perform those duties. The de facto officer doctrine seeks practicality and is applied when the defect at issue did not undermine the administration of government or an individual's rights. In this case, the defect did neither.

Finally, we have previously applied the de facto officer doctrine to residency requirements of a kind. *See Rich Mfg. Co. v. Petty*, 241 Iowa 840, 842, 846, 42 N.W.2d 80, 81, 84 (1950) (applying the doctrine when one member of a county board of supervisors was not a freeholder and other members were not adequately representative of certain townships). Farm Bureau emphasizes the need for "geographical . . . boundaries" to the de facto officer doctrine. In this regard, Farm Bureau imagines an elaborate scenario in which La Seur could move to a foreign country and renounce her American citizenship, and yet the Commission would still assert the doctrine applies. Of course, nothing in section 455A.6 beyond the elector requirement suggests actual residency is a qualification of office. *Compare* Iowa Code § 455A.6, *with id.* § 39.27 ("An elected official

shall continue to be a resident of the state, district, county, township, city, or ward by or for which the person was elected, or in which the duties of the office are to be exercised for the duration of the term of office.").

Our result in *Rich Manufacturing* is in accord with many other courts considering whether the de facto officer doctrine applies to elector and residency requirements. *See, e.g., Gwin v. State*, 808 So. 2d 65, 67 (Ala. 2001); *Gates v. City of Tenakee Springs*, 954 P.2d 1035, 1038 (Alaska 1998); *Juliani v. Darrow*, 119 P.2d 565, 568 (Ariz. 1941); *Brown v. Anderson*, 198 S.W.2d 188, 191 (Ark. 1946); *People ex rel. Hoffman v. Hecht*, 38 P. 941, 944 (Cal. 1895); *State ex rel. James v. Deakyne*, 58 A.2d 129, 131 (Del. Super. Ct. 1948); *Hagood v. Hamrick*, 157 S.E.2d 429, 430–31 (Ga. 1967); *State v. Duncan*, 54 N.E. 1066, 1066–67 (Ind. 1899); *Patterson v. Miller*, 59 Ky. 493, 496 (1859); *State v. White*, 101 So. 136, 140 (La. 1924); *Baker v. State*, 833 A.2d 1070, 1086 (Md. 2003); *Greyhound Corp. v. Mich. Pub. Serv. Comm'n*, 104 N.W.2d 395, 401–02 (Mich. 1960); *Bird v. State*, 122 So. 539, 540 (Miss. 1929); *In re Oak St.*, 273 S.W. 105, 109 (Mo. 1925); *Prescott v. Hayes*, 42 N.H. 56, 58–59 (1860); *State ex rel. Newman v. Jacobs*, 17 Ohio 143, 152–53 (1848); *Franks v. Ponca City*, 38 P.2d 912, 913 (Okla. 1934); *Graham v. Sch. Dist. No. 69*, 54 P. 185, 187 (Or. 1898); *Dove v. Kirkland*, 75 S.E. 503, 507 (S.C. 1912); *Roche v. Jones*, 12 S.E. 965, 966 (Va. 1891); *Green Mountain Sch. Dist. No. 103 v. Durkee*, 351 P.2d 525, 528 (Wash. 1960); *State ex rel. Schneider v. Darby*, 190 N.W. 994, 998 (Wis. 1922); *Crawford v. City of Sheridan*, 392 P.2d 519, 520 (Wyo. 1964). *But see Orndorff v. Potter*, 25 S.E.2d 911, 912 (W. Va. 1943) (recognizing a nonresident who receives the most votes for elected office does not hold the office, but not discussing the de facto officer doctrine).

In the final analysis, the practical nature of the de facto officer doctrine supports our conclusion to uphold the validity of the Commission action taken in this case. The only real support for a contrary conclusion is found in the failure of La Seur to maintain her required status as an elector. Yet, the de facto officer doctrine exists to validate official action when an underlying requirement is not satisfied. Thus, the mere failure to qualify is not enough. Moreover, the disqualification in this case did not undermine the integrity and confidence in the process followed by the Commission or in the Commission decision. When La Seur lost her status as an elector, the loss did not render her unqualified to do her job.

We understand a different scenario or fact situation can be proposed that would render the application of the de facto officer doctrine inappropriate. Such a proposition, however, does not serve to undermine the appropriate application of the doctrine under the facts of this case. Thus, we confine our analysis to the facts of this case, as we are required to do, and apply the law consistently with its application in the past. The de facto officer doctrine has served a valid role in maintaining the government process since the earliest years of our statehood, and it continues to do so today.

**B. Amendment to IAPA.** We next turn to the argument by Farm Bureau that the 1998 amendments to the IAPA abrogated the de facto officer doctrine. The IAPA establishes the exclusive means for a person or party adversely affected by agency action to seek judicial review. Iowa Code § 17A.19. Prior to 1998, the Act permitted a court to reverse or grant other relief from agency action when, among other reasons, it was "[a]ffected by other error of law." *See* Iowa Code § 17A.19(8)(*e*) (1997). In 1998, the statute was amended to require a court to reverse, modify, or

grant other relief when "[t]he product of the decision making undertaken by persons who were improperly constituted as a decision-making body, were motivated by an improper purpose, or were subject to disqualification" if the court determines the infirmity in the agency action "prejudiced" the "substantial rights" of the person seeking judicial relief. 1998 Iowa Acts ch. 1202, § 24 (codified at Iowa Code § 17A.19(10)(*e*) (2011)). The gist of Farm Bureau's argument is that the de facto officer doctrine is now incompatible with section 17A.19(10)(*e*), and has been abolished by implication.

When the legislature amends a statute, we have said that "any material change in the language of a statute is presumed to alter the law." *State v. Ahitow*, 544 N.W.2d 270, 273 (Iowa 1996). Moreover, "[t]he common law may be repealed by implication in a statute that plainly expresses the legislature's intent to do so." *Atwood v. Vilsack*, 725 N.W.2d 641, 644–45 (Iowa 2006).

Yet, "[c]onstitutional or statutory provisions do not repeal the common law by implication unless the intention to do so is plain." *Iowa Civil Liberties Union v. Critelli*, 244 N.W.2d 564, 568 (Iowa 1976).

> "To the contrary, the legislature will be presumed not to intend to overturn long-established principles of law, and the statute will be so construed, unless an intention to do so plainly appears by express declaration or necessary or unmistakable implication, and the language employed admits of no other reasonable construction."

*Ritter v. Dagel*, 261 Iowa 870, 879, 156 N.W.2d 318, 323 (1968) (quoting 50 Am. Jur. *Statutes* § 340, at 333), *superseded by rule as stated in In re Estate of Steinberg*, 443 N.W.2d 711, 712 (Iowa 1989); *accord Wilson*, 165 N.W.2d at 822; *cf. State v. Osborn*, 368 N.W.2d 68, 69–70 (Iowa 1985) ("We start with the premise that changes made by revision of a statute will not be construed as altering the law unless the legislature's intent to

accomplish a change in its meaning is clear and unmistakable.").  After all, some statutes "are merely declaratory of the common law."  *Wilson*, 165 N.W.2d at 822; *see also City of Hiawatha v. Reg'l Planning Comm'n*, 267 N.W.2d 31, 32 (Iowa 1978) ("The statute merely codifies the common-law rule.").  Additionally, "[w]e are obliged . . . to interpret statutes in conformity with the common law wherever statutory language does not directly negate it."  *Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 452 (Iowa 1988).  Thus, our focus is on the intent of the legislature.

In this case, there is simply no indication the legislature intended to abolish the de facto officer doctrine when it amended section 17A.19(10)(*e*).  Section 17A.19(10)(*e*) does not mention the de facto officer doctrine, and we recognize the legislature certainly understands the venerable role of the de facto officer doctrine that has been embedded throughout our law.  For example, in the area of disputes over title to land, it specifically applied the doctrine by providing:

> In all actions and controversies involving the question of title to a parcel held under a county treasurer's deed, all acts of assessors, treasurers, auditors, supervisors, and other *officers de facto* shall be of the same validity as acts of officers de jure.

Iowa Code § 448.14 (emphasis added).  Considering the historical presence of the de facto officer doctrine in our law, it is very unlikely the legislature would have intended to uproot and abrogate it by simply identifying the grounds for judicial review in greater specificity.

We also think it is significant that the leading authority on administrative procedure law did not mention any claim or theory in his treatise on the Act following the 1998 amendments to indicate the amendments were intended to abrogate the de facto officer doctrine.  In

fact, Professor Bonfield's comment on the amended section 17A.19(10)(*e*) was limited to a single sentence: "Paragraphs (d) and (e) are beneficial, clarifying elaborations of current IAPA § 17A.19(8) paragraphs (d)-(e)." Arthur E. Bonfield, *Proposed New Iowa Administrative Procedure Act (SF 2404) with Comments by Reporter-Draftsman* 192 (1996); *accord* Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act (1998), Chapter 17A, Code of Iowa (House File 667 as Adopted) Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 64 (1998) ("Paragraphs (d) and (e) are beneficial, clarifying elaborations of original IAPA section 17A.19(8)(d)-(e).").[8]   At the same time, Professor Bonfield provided valuable and detailed comment on other amendments to section 17A.19.   We think the nation's leading authority on administrative law, who has been instrumental over the years in assisting the Iowa legislature in drafting its Act, would have devoted considerable commentary and analysis to section 17A.19 (10)(*e*) if the purpose of the 1998 amendments was to abrogate an important, centuries-old common law doctrine that is deeply embedded into our law.

In contrast, in *Estate of Woodroffe*, we reasoned that the drafters of 1984 Model Business Corporation Act (upon which our legislature based the Iowa Act) expressly stated "they intended to do away with the de facto corporation concept through provisions mirroring" Iowa Code sections 490.203 and 490.204.   742 N.W.2d 94, 103 (Iowa 2007) (citing 5 Matthew G. Doré, *Iowa Practice Series, Business Corporations* § 16:9 (2007)).   Unlike the statutes in *Estate of Woodroffe*, the IAPA

---

[8]The previous version of the statute permitted reversal of an agency decision when it was "(d) [m]ade upon unlawful procedure" or "(e) [a]ffected by other error of law." Iowa Code § 17A.19(8) (1997).

amendments were merely intended to clarify the scope of the previous statute.[9]

Finally, our rule that presumes the legislature intended to change legal rights and construction of statutory terms by amending the statutory text does not impact this case. We have said in the past, " 'The legislature is presumed to know the state of the law, including case law, at the time it enacts a statute.' " *Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 600 (Iowa 2011) (quoting *State v. Jones*, 298 N.W.2d 296, 298 (Iowa 1980)). Similarly,

---

[9]We recognize many issues are presented by the amendments to the IAPA, but these issues do not impact the de facto officer doctrine. We need not determine the precise meaning of "improperly constituted." Iowa Code § 17A.19(10)(*e*). After all, our inquiry today is only whether a clear legislative intent to overrule a century-and-a-half of caselaw plainly appears. *See Ritter*, 261 Iowa at 879, 156 N.W.2d at 323. It does not. In all likelihood, of course, an improperly constituted board is probably one that does not have quorum to act. Setting aside action taken without quorum is a reasonable application of section 17A.19(10)(*e*). Nor would the de facto officer doctrine apply in such a case, as the board as a whole is the problem, not the credentials of an isolated board member.

Interestingly, section 455A.6(5) itself provides that "[a] majority of the members of the commission is a quorum, and a majority of a quorum may act in any matter within the jurisdiction of the commission, unless a more restrictive rule is adopted by the commission." Iowa Code § 455A.6(5) In this case, all nine members of the Commission were present at the vote regarding the antidegradation policy. Clearly, a quorum existed. Similarly, section 455A.6 itself would seemingly only require five votes in favor of the antidegradation policy. *See id.* § 455A.6(1). Because we have determined Heathcote's vote in favor of the rule was not improper, any inquiry into whether La Seur's participation was acceptable is conceivably moot. In this way, Farm Bureau's "substantial rights . . . have [not] been prejudiced." Iowa Code § 17A.19(10); *see also City of Des Moines v. Pub. Emp't Relations Bd.*, 275 N.W.2d 753, 759 (Iowa 1979) (indicating the "substantial rights" language in the IAPA is "analogous to the harmless error rule"). Of course, as we mentioned above, our decision in *Wilson* rejected the view that a conflicted official's participation is not insulated from scrutiny merely by not being the deciding vote. *See* 165 N.W.2d at 819–20. Arguably, *Wilson* applies here as well. Surely, however, a plain reading of *Wilson* reveals its reasoning is limited to conflicts of interest and has nothing to do with good-faith participation by an official in spite of a technical inability to hold office. *See id.* at 819 ("[A] vote case *in violation of a conflict of interest statute*, even if immaterial to the outcome, vitiates the proceeding." (Emphasis added.)). Notwithstanding, no party has made such an argument, and we do not consider it further here.

> "The legislature is presumed to know the prior construction of terms in the original act, and an amendment substituting a new term or phrase for one previously construed indicates that the judicial or executive construction of the former term or phrase did not correspond with the legislative intent and a different interpretation should be given the new term or phrase. Thus, in interpreting an amendatory act there is a presumption of change in legal rights. This is a rule peculiar to amendments and other acts purporting to change the existing statutory law."

*State ex rel. Palmer v. Bd. of Supervisors*, 365 N.W.2d 35, 37 (Iowa 1985) (quoting 1A Sutherland, *Statutory Construction* § 22.30, at 178 (4th ed. 1973)). Thus, an amendment to statutory text following our construction of the text raises a presumption that the legislature intended to alter the rights explained by our cases. *See Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 49 (Iowa 2012). In the present case, we decided three de facto officer doctrine cases in the years immediately preceding the 1998 amendments, and the court of appeals decided one. *See Windsor Heights*, 572 N.W.2d at 593–94; *Palmer*, 554 N.W.2d at 865–66; *Allen*, 528 N.W.2d at 587–88; *Glawe v. Ohlendorf*, 547 N.W.2d 839, 842 (Iowa Ct. App. 1996). However, none of these cases purport to interpret the predecessor of section 17A.19(10)(*e*). *See Windsor Heights*, 572 N.W.2d at 593–94; *Palmer*, 554 N.W.2d at 865–66; *Allen*, 528 N.W.2d at 587–88. Indeed, three of the four involved officers *not subject to the Administrative Procedure Act. See Windsor Heights*, 572 N.W.2d at 593–94; *Palmer*, 554 N.W.2d at 865–66; *Glawe*, 547 N.W.2d at 842. Only *Allen* involved the IAPA, but we did not interpret section 17A.19(8)(*e*) in that case. *See* 528 N.W.2d at 587–88. Unlike *Postell*, nothing about the statutory text or the timing of the amendments suggests an intention to abolish our de facto officer doctrine by amending section 17A.19(8)(*e*).

In this case, the legislature merely identified specific challenges to agency action in the amendments to section 17A.19(8)(*e*), some of which

may overlap challenges considered under the de facto officer doctrine as not serious enough to warrant overturning the official action that is challenged. The statute only directs the court to grant relief from an agency decision by a person who was disqualified when substantial rights of the petitioner were prejudiced because of the infirmity. This standard, as we have identified, is entirely consistent with the standard governing the de facto officer doctrine. *Compare* Iowa Code § 17A.19(10) *and City of Des Moines v. Pub. Emp't Relations Bd.*, 275 N.W.2d 753, 759 (Iowa 1979), *with Windsor Heights*, 572 N.W.2d at 593–94. Under section 17A.19(10)(*e*), as under the de facto officer doctrine, minor or technical infirmities that did not prejudice the substantial rights of those affected by the decision do not permit courts to grant relief. *See* Iowa Code § 17A.19(10)(*e*). Thus, the statute works hand-in-hand with the amended statute. It is not inconsistent with the continuing purpose of the doctrine, and it does not undermine the application of the doctrine. Instead, the doctrine continues to play an important role in the operation of the government in this state and recognizes that the grounds for relief from official action does not always mean those grounds are enough to overturn the action taken. We conclude the legislature did not intend to abolish the de facto officer doctrine by implication. Because the doctrine survived the 1998 Administrative Procedure Act amendments and applies to the facts of this case, we hold the district court correctly granted summary judgment to the Commission regarding Commissioner La Seur.

## VI. Conclusion.

The district court did not err by granting summary judgment to the Commission regarding both Heathcote's and La Seur's participation. The district court also did not err by granting summary judgment without

affording Farm Bureau an opportunity to obtain the internal emails from the Iowa Environmental Council regarding the scope of Heathcote's job function. Accordingly, we affirm the decision of the district court.

**AFFIRMED.**

All justices concur except Waterman, Mansfield, and Zager, JJ., who concur in part and dissent in part.

58

#12–0827, *Iowa Farm Bureau v. Env'tl Prot. Comm'n*

**WATERMAN, Justice (concurring in part and dissenting in part).**

I respectfully concur in part and dissent in part. I agree with the majority's conclusion that Commissioner Heathcote's position with an environmental organization did not disqualify her from voting on the antidegradation rules promulgated by the Environmental Protection Commission. The statute creating the Commission provides that a majority of the commissioners will be actively engaged in activities directly affected by environmental regulations. *See* Iowa Code § 455A.6(1)(*a*)–(*c*) (2009).[10] Accordingly, viewpoint bias is contemplated and permitted, and Farm Bureau failed to establish grounds to disqualify Heathcote.[11]

I disagree, however, with the majority's conclusion as to Commissioner La Seur. The law requires every commissioner to be an "elector[] of the state." *Id.* § 455A.6(1). It is undisputed La Seur lost that status when she moved to Montana and registered to vote in Montana. Yet, she continued to serve on the Commission, traveling back to Iowa to vote in favor of the antidegradation rules.

---

[10]Iowa Code section 455A.6 creates a nine-member commission and requires that three members shall be "actively engaged in livestock and grain farming," one member shall be "actively engaged in the business of finance or commerce," and one member shall be "actively engaged in the management of a manufacturing company." Iowa Code § 455A.6(1)(*a*)–(*c*).

[11]The record suggests that Commissioner Heathcote may have counseled her colleagues in the environmental organization at the Iowa Environmental Council on how to lobby for the antidegradation rules while the proposed rules were pending before the Commission. Farm Bureau, however, has not advanced this as a ground for disqualifying her, focusing instead on allegations of bias and conflict of interest. I agree with the majority that Commissioner Heathcote's outside employment with Iowa Environmental Council and her policy positions do not disqualify her from voting on the antidegradation rules. I leave for another day whether a commissioner can vote on a rulemaking proceeding when the commissioner also was personally involved in outside lobbying on that same proceeding.

This is not some mere technicality. As the majority emphasizes in the Heathcote portion of its opinion, the Commission has a "broad mandate of authority" and engages in "policy rulemaking" for Iowa. Thus, it is fair and reasonable for the legislature to require that its members *be* Iowans. As I discuss below, the same requirement applies to all elected state and local officials in Iowa, and all judicial officers, as well as certain other boards and commissions. The Commission concedes La Seur was not an elector of this state when she voted for the antidegradation rules.

The majority acknowledges that La Seur ceased to be qualified to serve once she moved to Montana, but nonetheless upholds her participation based on the de facto officer doctrine. According to the majority's view of the de facto officer doctrine, the only way to stop an unqualified public official from voting or acting is to bring a quo warranto proceeding to get her or him removed. Meanwhile, while such a proceeding works its way through the courts, the official can continue to vote or act, and affected citizens have no remedy.

I think this is wrong. The legislature corrected this unfairness and narrowed the de facto officer doctrine when it adopted the 1998 amendments to the Iowa Administrative Procedure Act (IAPA), Iowa Code ch. 17A. *See* 1998 Iowa Acts ch. 1202, § 24 (codified at Iowa Code § 17A.19(10) (2001)). While the de facto officer doctrine may still preclude *collateral* attack on a past agency action, since 1998 a party may seek *direct* review of agency action on the ground that one or more decision-makers should have been disqualified. Specifically, Farm Bureau can challenge the Commission's action under Iowa Code section 17A.19(10)(*e*) (2009) as "[t]he product of decision making undertaken by persons who were improperly constituted as a decision-making body . . .

or were subject to disqualification." The majority disregards that amendment to the IAPA. I would hold that because La Seur was disqualified from voting and the Commission was improperly constituted with her participating, the antidegradation rules are void.

The majority's use of the de facto officer doctrine—to uphold a vote after La Seur moved her residence to Montana—undermines a variety of residency requirements in the Iowa Code and Constitution.[12] Justices of this court, for example, must be Iowa residents. Iowa Code § 46.14(1); *see also* Iowa Const. art. V, § 18 (requiring justices to be members of the Iowa bar). Does the de facto officer doctrine allow me to move to Florida and continue voting on decisions of our court, despite objections from the parties, until I am thrown out of office?

As the majority points out, the Commission was exercising a quasi-legislative function when engaged in rulemaking. Our legislature requires EPC commissioners to live in Iowa to ensure environmental regulations are promulgated by Iowans who understand conditions in

---

[12]*See, e.g.*, Iowa Const. art. III, § 4 (stating a state representative "shall have been an inhabitant of this state one year next preceding his election, and at the time of his election shall have had an actual residence of sixty days in the county, or district he may have been chosen to represent"); *id.* art. III, § 5 (requiring state senators to satisfy the same residence requirement as state representatives); *id.* art. IV, § 6 (requiring the Governor and Lieutenant Governor to be Iowa residents); *id.* art. V, § 16 (requiring members of the judicial nominating commissions to be Iowa electors); Iowa Code § 217.2(1)(*c*) (2013) (requiring members of the Council on Human Services to be Iowa electors); *id.* § 330.20 (requiring members of local airport commission to be residents "of the city or county establishing the commission or a resident of a city or county in this state served by the airport"); *id.* § 347.9 (requiring trustees of a county public hospital to be residents of the county); *id.* § 368.14 ("A local representative [to the City Development Board] must be a registered voter of the territory or city which the representative represents . . . ."); *id.* § 400.17(3) ("[Civil service e]mployees shall not be required to be a resident of the city in which they are employed, but they shall become a resident of the state within two years of such appointment or the date employment begins and shall remain a resident of the state during the remainder of employment."); *id.* § 421.1(1) ("The state board of tax review . . . shall consist of three members who shall be registered voters of the state . . . .").

our state and who will live under the rules they issue. *See* Iowa Code § 455A.6(1) ("The members shall be electors of the state . . . ."). "Wherever qualifications are fixed there is a division into classes; that is to say, there is a class which may serve, *and another that may not.*" *State ex rel. Jones v. Sargent*, 145 Iowa 298, 307, 124 N.W. 339, 343 (1910) (emphasis added). The legislature did not allow exceptions for carpetbaggers. Common sense tells us that a public official will have a greater interest in the rules he or she is voting on, will possess a greater understanding of the issues in question, and will lend more credibility and confidence to the proceeding if he or she is a resident—or specifically in this case an elector—of the jurisdiction affected by the actions of that public official.

The important purposes served by residency requirements have been noted in many court decisions. *See, e.g., Woodward v. City of Deerfield Beach*, 538 F.2d 1081, 1083 (5th Cir. 1976) (noting durational residency requirements ensure "candidate knowledge of the issues and problems of the area"); *Triano v. Massion*, 513 P.2d 935, 938 (Ariz. 1973) (finding a residency requirement that candidates had to be qualified electors for six months was supported by the conclusion that candidates living in the districts they represent are likely to familiarize themselves with the people and the problems of the district); *State v. Macias*, 783 P.2d 255, 258 (Ariz. Ct. App. 1989) (noting a state constitutional provision requiring elected officers to be "qualified elector[s]" of the state at the time of the election was intended to prevent "political carpetbagging," and without such qualifications, "anyone in Arizona or elsewhere would be free to run for the office of Mayor of Nogales so long as he or she established residence after the election in time to be a qualified elector before the term of office began"); *Wall v. Mun. Ct.*, 272

Cal. Rptr. 702, 703–04 (Ct. App. 1990) (noting that "the possibility that citizen confidence in the adjudication of traffic cases increases when they are handled by local residents" was an important legislative goal that was sufficient to justify the requirement that traffic commissioners be residents of the county in which they are appointed); *Snyder v. Boulware*, 96 P.2d 913, 915 (Mont. 1939) (indicating the purpose of a residency requirement for county commissioners "was to disqualify those who were not familiar with the needs of the particular section of the county"); *Gangemi v. Rosengard*, 207 A.2d 665, 668 (N.J. 1965) (noting its previous caselaw supports a residency requirement for city commissioners on the theory that "residence assures a rudimentary understanding of local conditions"); *Horwitz v. Reichenstein*, 103 A.2d 881, 882 (N.J. 1954) (stating the "lack of residence in his ward by a ward councilman imperil[s] the representation of the ward in the sense intended by the statute"); *Farnsworth v. Jones*, 441 S.E.2d 597, 602 (N.C. 1994) (indicating one rationale of a residency requirement is to "ensure that elected officials sincerely represent the residents of a particular district"). The majority opinion thwarts the legislature's goal of ensuring the Commission regulations are promulgated exclusively by Iowans who will live under those regulations.

But, the fundamental problem with the majority's opinion is that it conflicts with the IAPA.[13] Prior to 1998, the IAPA only allowed courts to reverse or modify agency action

---

[13]The purpose of the IAPA is, in part, "to simplify the process of judicial review of agency action as well as increase its ease and availability." Iowa Code § 17A.1(3). The IAPA "is meant to apply to all rulemaking and contested case proceedings and all suits for the judicial review of agency action." *Id.* § 17A.1(2); *accord IES Utils., Inc. v. Iowa Dep't of Revenue & Fin.*, 545 N.W.2d 536, 539 (Iowa 1996) ("The [I]APA generally

if substantial rights of the petitioner ha[d] been prejudiced because the agency action [was]:

> *a.* In violation of constitutional or statutory provisions;

> *b.* In excess of the statutory authority of the agency;

> *c.* In violation of an agency rule;

> *d.* Made upon unlawful procedure;

> *e.* Affected by other error of law;

> *f.* In a contested case, unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole; or

> *g.* Unreasonable, arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

Iowa Code § 17A.19(8) (1997). Significantly, however, in the 1998 amendment, the following language was added:

> The court shall reverse, modify, or grant other appropriate relief from agency action, equitable or legal and including declaratory relief, if it determines that substantial rights of the person seeking judicial relief have been prejudiced because the agency action is any of the following:

> . . . .

> *e.* The product of decision making undertaken by persons who were improperly constituted as a decision-making body . . . or were subject to disqualification.

*See* 1998 Iowa Acts ch. 1202, § 24. La Seur was subject to disqualification once she moved to Montana.[14] And, the Commission was improperly constituted when it included a voting member, La Seur, who had lost her required status as an Iowa elector. This provision precludes use of the de facto officer doctrine here.

---

allows . . . judicial review from an agency action to district court whether the action is rulemaking, a contested case, or 'other agency action.' ").

[14]La Seur is a graduate of the Yale Law School and a licensed attorney. She should have known that moving to Montana and registering to vote there would end her status as an Iowa elector and would disqualify her from continued service on the Commission.

The 1998 amendment to the IAPA renders irrelevant the majority's lengthy discussion of the history and development of the common law de facto officer doctrine in Iowa and the federal courts. The 1998 amendment to the IAPA expressly allows parties to challenge and empowers courts to review agency action that previously would have been upheld under the common law de facto officer doctrine. The majority notes that, historically, we have "applied the [de facto officer] doctrine to . . . errors in election or appointment." However, none of the cases cited by the majority address an improperly constituted decision-making body or member subject to disqualification after the 1998 amendments to the IAPA. Those cases cited by the majority predated the 1998 amendment and are no longer apposite. *See, e.g., State v. Cent. States Elec. Co.*, 238 Iowa 801, 818, 28 N.W.2d 457, 466 (1947); *Cowles v. Indep. Sch. Dist.*, 204 Iowa 689, 698–699, 216 N.W. 83, 87–88 (1927); *Metro. Nat'l Bank v. Commercial State Bank*, 104 Iowa 682, 687, 74 N.W. 26, 28 (1898). Similarly, because there is no analogous federal provision to Iowa Code section 17A.19(10)(*e*) (2009), the federal caselaw discussed by the majority is inapposite.

The majority's interpretation renders part of section 17A.19(10)(*e*) without effect, contrary to our canons of construction. *See Bearinger v. Iowa Dep't of Transp.*, 844 N.W.2d 104, 110 (Iowa 2014) ("We are to interpret [legislation] in a manner to avoid . . . rendering any part of the enactment superfluous." (internal quotation marks omitted)); *State v. Keutla*, 798 N.W.2d 731, 734 (Iowa 2011) ("We seek an interpretation that does not render portions of [a statute] redundant or irrelevant."). By concluding the agency action must be upheld under the de facto officer doctrine, the majority effectively cuts off any opportunity to seek review under the "subject to disqualification" language of section 17A.19(10)(*e*)

and leaves it meaningless. What does that term mean if it can be trumped by the de facto officer doctrine? The majority offers no answer.

Rather, the majority concludes the de facto officer doctrine survives the 1998 amendment because that term is not mentioned in section 17A.19(10)(*e*). Yet, as the majority acknowledges, we presume amendments to statutes alter the law. *See Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 49 (Iowa 2012) ("Finally, when the legislature amends a statute, it raises a presumption that the legislature intended a change in the law."). And, as the majority further acknowledges, "[t]he common law may be repealed by implication in a statute that plainly expresses the legislature's intent to do so." *Atwood v. Vilsack*, 725 N.W.2d 641, 644–45 (Iowa 2006). That is what we have here. The majority's interpretation is not supported by its reliance on the rule of construction that statutes are presumed not to repeal the common law. Our legislature has overruled that rule of construction:

> The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this Code. Its provisions and all proceedings under it shall be liberally construed with a view to promote its objects and assist the parties in obtaining justice.

Iowa Code § 4.2.

Farm Bureau's challenge is the exact situation contemplated by the statute. There is no question that La Seur, at the time of the action in question, was subject to disqualification under Iowa Code section 455A.6(1). The parties agree she was no longer an Iowa elector at the time of the vote in question. Therefore, I would conclude the decision-making body was improperly constituted with her voting participation. *See* Iowa Code § 455A.6(1) (requiring all Commission members to be electors of the State of Iowa).

Next, Farm Bureau has shown its "substantial rights" were prejudiced by La Seur's act of voting while disqualified. *See* Iowa Code § 17A.19(10) ("The court shall reverse, modify, or grant other appropriate relief from agency action, equitable or legal and including declaratory relief, if it determines that substantial rights of the person seeking judicial relief have been prejudiced . . . ."). We have described the "substantial rights" language as follows:

> We have found this "substantial rights" language analogous to a harmless error rule. We recognize the commissioner's action "should not be tampered with unless the complaining party has in fact been harmed." This form of analysis is appropriate because it would be inefficient for us to provide relief from invalid agency action when the particular invalidity has not prejudiced the substantial rights of the petitioner. Therefore, [the complainant] bears the burden of demonstrating both the invalidity of the agency's action and resulting prejudice.

*Hill v. Fleetguard, Inc.*, 705 N.W.2d 665, 671 (Iowa 2005) (citations omitted).

Prejudice is easily established here. We have long held that a vote is invalid when one member of a voting body should have been disqualified from voting, even when the tainted member's vote is not decisive. *See, e.g.*, *Wilson v. Iowa City*, 165 N.W.2d 813, 819 (Iowa 1969). In *Wilson*, the five members of the city council of Iowa City voted on and adopted resolutions related to urban renewal. *Id.* at 816–17. However, at the time of the votes, at least one member of the council was prohibited by a statute from voting on issues related to urban renewal because of an existing conflict of interest. *Id.* at 817, 820–21. In determining whether the vote should be vacated, even when the vote of the disqualified member would not have changed the outcome, we held "the better rule holds a vote cast in violation of a conflict of interest statute, even if immaterial to the outcome, vitiates the proceeding." *Id.* at

819. We noted two rationales supported such a rule: (1) "the participation of the disqualified member in the discussion may have influenced the opinion of the other members," and (2) "such participation may cast suspicion on the impartiality of the decision." *Id.* at 820 (internal quotation marks omitted). We stated, "It being impossible to determine whether the virus of self-interest affected the result, it must . . . be assumed that it dominated the body's deliberations, and that the judgment was its product." *Id.* (internal quotation marks omitted). The same is true here.

La Seur's participation while disqualified may have influenced the opinion of the other members, and in the very least, it casts suspicion on the decision. As in *Wilson*, it is impossible for us to know the exact impact of La Seur's participation. The Iowa cases relied upon by the majority for the de facto officer doctrine predated both *Wilson* and the IAPA.

The majority, by denying Farm Bureau's challenge raised on direct review, renders meaningless the requirement that Commissioners be Iowa residents. I would conclude La Seur's failure to maintain her status as an Iowa elector enables the district court to review the agency's action under Iowa Code section 17A.19(10)(*e*), and summary judgment was improperly granted to the EPC on the issue.

Even if this case was decided under our common law, I would find La Seur's vote is not validated by the de facto officer doctrine. Because of the foregoing rationales for residency and elector requirements, I disagree with the majority's contention that La Seur's failure to maintain her status as an Iowa elector "is comparable to that of an elected official who fails to properly take the oath of office." Taking the oath of office is a technical procedure to be performed before an otherwise qualified

candidate takes office. By contrast, the requirement that each member of the commission be an elector of this state is a condition of holding office that is fundamental, not technical. This residency requirement cannot be remedied through a procedural step such as taking or retaking an oath.

La Seur's failure to maintain her status as an Iowa elector is similar to the failure of the officer in *State v. Palmer* to take the required training course prior to administering a breath test. *See* 554 N.W.2d 859, 864–65 (Iowa 1996). In that case, we noted allowing an officer to be considered a de facto peace officer approved to administer the test without the proper training would "ignore the legislature's decision to define 'peace officer' more narrowly for purposes of the implied consent law," and "would completely ignore [the statute]'s requirement of specialized OWI training." *Id.* at 865. We further noted the absence of the training was more than a "technical infirmity" because the training provided safeguards to protect the citizens of Iowa from improperly administered tests with consequential criminal and administrative penalties including loss of driving privileges. *See id.* at 865–66. As the majority points out, "the de facto officer doctrine is not applied when the particular disqualification at issue undermines the integrity and confidence demanded in actions taken or decisions made by government."

Here, allowing La Seur to vote on rules affecting the citizens of Iowa when she did not meet the basic qualification that she be an Iowa elector "ignore[s] the legislature's decision" to require commissioners to be electors of the state. *See id.* at 865; *cf. Sargent,* 145 Iowa at 307, 124 N.W. at 343 ("The fixing of qualifications for office is a legislative and not a judicial function."). Further, as noted above, the elector requirement

protects Iowa's citizens by ensuring that those individuals responsible for making rules that will affect the citizens of the state will be interested and invested in the outcome of the rulemaking procedures, as they themselves will live under the rules that are enacted. Therefore, the failure to maintain status as an elector of the state is more than a technical infirmity. As one of only two qualifications required of every commission member, it "goes to the heart" of the qualifications set forth under section 455A.6(1), and therefore, La Seur's vote should not be rescued by the de facto officer doctrine. *See Palmer*, 554 N.W.2d at 865.

For these reasons, I conclude La Seur's failure to maintain her status as an Iowa elector, as required by Iowa Code section 455A.6(1), left her subject to disqualification and rendered the Commission an improperly constituted decision-making body. *See* Iowa Code § 17A.19(10)(*e*). That statute trumps the de facto officer doctrine. But, even under the majority's common law analysis, La Seur's participation should not be excused by the de facto officer doctrine. Her participation in voting, therefore, invalidates the Commission's antidegradation rules. *See Wilson*, 165 N.W.2d at 820. Accordingly, I would reverse the district court's entry of summary judgment against Farm Bureau.

Mansfield and Zager, JJ., join this concurrence in part and dissent in part.